COLORADO REPUBLICAN FEDERAL CAMPAIGN
COMMITTEE ET AL. *v.* FEDERAL ELECTION
COMMISSION

No. 95–489.   Argued April 15, 1996—Decided June 26, 1996

606

BREYER, J., announced the judgment of the Court and delivered an opinion, in which O'CONNOR and SOUTER, JJ., joined. KENNEDY, J., filed an opinion concurring in the judgment and dissenting in part, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 626. THOMAS, J., filed an opinion concurring in the judgment and dissenting in part, in which REHNQUIST, C. J., and SCALIA, J., joined as to Parts I and III, *post*, p. 631. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post*, p. 648.

*Jan Witold Baran* argued the cause for petitioners. With him on the briefs were *Thomas W. Kirby, Carol A. Laham,* and *Michael E. Toner.*

*Solicitor General Days* argued the cause for respondent. With him on the brief were *Deputy Solicitor General Bender, Malcolm L. Stewart, Lawrence M. Noble, Richard B. Bader,* and *Rita A. Reimer.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *David H. Remes, David H. Miller, Arthur B. Spitzer, Steven R. Shapiro, Joel M. Gora,* and *Arthur N. Eisenberg;* for the Democratic National Committee et al. by *Joseph E. Sandler* and *Robert F. Bauer;* for the National Right to Life Committee, Inc., by *James Bopp, Jr.,* and *Richard E. Coleson;* and for the Washington Legal

JUSTICE BREYER announced the judgment of the Court and delivered an opinion, in which JUSTICE O'CONNOR and JUSTICE SOUTER join.

In April 1986, before the Colorado Republican Party had selected its senatorial candidate for the fall's election, that party's Federal Campaign Committee bought radio advertisements attacking Timothy Wirth, the Democratic Party's likely candidate. The Federal Election Commission (FEC) charged that this "expenditure" exceeded the dollar limits that a provision of the Federal Election Campaign Act of 1971 (FECA or Act) imposes upon political party "expenditure[s] in connection with" a "general election campaign" for congressional office. 90 Stat. 486, as amended, 2 U. S. C. § 441a(d)(3). This case focuses upon the constitutionality of those limits as applied to this case. We conclude that the First Amendment prohibits the application of this provision to the kind of expenditure at issue here—an expenditure that the political party has made independently, without coordination with any candidate.

Foundation et al. by *Benjamin L. Ginsberg, Daniel J. Popeo,* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging affirmance were filed for the Brennan Center for Justice by *Burt Neuborne;* and for Common Cause et al. by *Roger M. Witten, Donald J. Simon,* and *Alan Morrison.*

Briefs of *amici curiae* were filed for the State of Kentucky et al. by *A. B. Chandler III,* Attorney General of Kentucky, *Pamela J. Murphy,* Deputy Attorney General, *Morgan G. Ransdell,* Assistant Attorney General, *Sheryl G. Snyder, Richard Blumenthal,* Attorney General of Connecticut, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Tom Udall,* Attorney General of New Mexico, *W. A. Drew Edmondson,* Attorney General of Oklahoma, and *Darrell V. McGraw, Jr.,* Attorney General of West Virginia; for the Committee for Party Renewal et al. by *E. Mark Braden* and *Stephen E. Gottlieb;* and for the Republican National Committee by *George J. Terwilliger III, John P. Connors, E. Duncan Getchell, Jr., Robert L. Hodges,* and *Darryl S. Lew.*

## I

To understand the issues and our holding, one must begin with FECA as it emerged from Congress in 1974. That Act sought both to remedy the appearance of a "corrupt" political process (one in which large contributions seem to buy legislative votes) and to level the electoral playing field by reducing campaign costs. See *Buckley* v. *Valeo*, 424 U. S. 1, 25–27 (1976) *(per curiam)*. It consequently imposed limits upon the amounts that individuals, corporations, "political committees" (such as political action committees, or PAC's), and political parties could *contribute* to candidates for federal office, and it also imposed limits upon the amounts that candidates, corporations, labor unions, political committees, and political parties could *spend*, even on their own, to help a candidate win election. See 18 U. S. C. §§ 608, 610 (1970 ed., Supp. IV).

This Court subsequently examined several of the Act's provisions in light of the First Amendment's free speech and association protections. See *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238 (1986); *Federal Election Comm'n* v. *National Conservative Political Action Comm.*, 470 U. S. 480 (1985) *(NCPAC); California Medical Assn.* v. *Federal Election Comm'n*, 453 U. S. 182 (1981); *Buckley, supra.* In these cases, the Court essentially weighed the First Amendment interest in permitting candidates (and their supporters) to spend money to advance their political views against a "compelling" governmental interest in assuring the electoral system's legitimacy, protecting it from the appearance and reality of corruption. See *Massachusetts Citizens for Life, supra,* at 256–263; *NCPAC, supra,* at 493–501; *California Medical Assn., supra,* at 193–199; *Buckley,* 424 U. S., at 14–23. After doing so, the Court found that the First Amendment prohibited some of FECA's provisions, but permitted others.

Most of the provisions this Court found unconstitutional imposed *expenditure* limits. Those provisions limited candidates' rights to spend their own money, *id.*, at 51–54, limited a candidate's campaign expenditures, *id.*, at 54–58, limited the right of individuals to make "independent" expenditures (not coordinated with the candidate or candidate's campaign), *id.*, at 39–51, and similarly limited the right of political committees to make "independent" expenditures, *NCPAC, supra,* at 497. The provisions that the Court found constitutional mostly imposed *contribution* limits—limits that apply both when an individual or political committee contributes money directly to a candidate and also when they indirectly contribute by making expenditures that they coordinate with the candidate, § 441a(a)(7)(B)(i). See *Buckley, supra,* at 23–36. See also 424 U. S., at 46–48; *California Medical Assn., supra,* at 193–199 (limits on contributions to political committees). Consequently, for present purposes, the Act now prohibits individuals and political committees from making direct, or indirect, contributions that exceed the following limits:

> (a) For any "person": $1,000 to a candidate "with respect to any election"; $5,000 to any political committee in any year; $20,000 to the national committees of a political party in any year; but all within an overall limit (for any individual in any year) of $25,000. 2 U. S. C. §§ 441a(a)(1), (3).
>
> (b) For any "multicandidate political committee": $5,000 to a candidate "with respect to any election"; $5,000 to any political committee in any year; and $15,000 to the national committees of a political party in any year. § 441a(a)(2).

FECA also has a special provision, directly at issue in this case, that governs contributions and expenditures by political parties. § 441a(d). This special provision creates, in part, an *exception* to the above contribution limits. That

is, without special treatment, political parties ordinarily would be subject to the general limitation on contributions by a "multicandidate political committee" just described. See § 441a(a)(4). That provision, as we said in subsection (b) above, limits annual contributions by a "multicandidate political committee" to no more than $5,000 to any candidate. And as also mentioned above, this contribution limit governs not only direct contributions but also indirect contributions that take the form of coordinated expenditures, defined as "expenditures made . . . in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." § 441a(a)(7)(B)(i). Thus, ordinarily, a party's coordinated expenditures would be subject to the $5,000 limitation.

However, FECA's special provision, which we shall call the "Party Expenditure Provision," creates a *general exception* from this contribution limitation, and from any other limitation on expenditures. It says:

> "Notwithstanding any other provision of law with respect to *limitations on expenditures or limitations on contributions,* . . . political party [committees] . . . may make *expenditures* in connection with the general election campaign of candidates for Federal office . . . ." § 441a(d)(1) (emphasis added).

After exempting political parties from the general contribution and expenditure limitations of the statute, the Party Expenditure Provision then imposes a *substitute limitation* upon party "expenditures" in a senatorial campaign equal to the greater of $20,000 or "2 cents multiplied by the voting age population of the State," § 441a(d)(3)(A)(i), adjusted for inflation since 1974, § 441a(c). The provision permitted a political party in Colorado in 1986 to spend about $103,000 in connection with the general election campaign of a candidate for the United States Senate. See FEC Record, vol. 12, no. 4, p. 1 (Apr. 1986). (A different provision, not at issue

in this case, § 441a(d)(2), limits party expenditures in connection with Presidential campaigns. Since this case involves only the provision concerning congressional races, we do not address issues that might grow out of the public funding of Presidential campaigns.)

In January 1986, Timothy Wirth, then a Democratic Congressman, announced that he would run for an open Senate seat in November. In April, before either the Democratic primary or the Republican convention, the Colorado Republican Federal Campaign Committee (Colorado Party or Party), a petitioner here, bought radio advertisements attacking Congressman Wirth. The State Democratic Party complained to the FEC. It pointed out that the Colorado Party had previously assigned its $103,000 general election allotment to the National Republican Senatorial Committee, leaving it without any permissible spending balance. See *Federal Election Comm'n* v. *Democratic Senatorial Campaign Comm.*, 454 U. S. 27 (1981) (state party may appoint national senatorial campaign committee as agent to spend its Party Expenditure Provision allotment). It argued that the purchase of radio time was an "expenditure in connection with the general election campaign of a candidate for Federal office," § 441a(d)(3), which, consequently, exceeded the Party Expenditure Provision limits.

The FEC agreed with the Democratic Party. It brought a complaint against the Colorado Party, charging a violation. The Colorado Party defended in part by claiming that the Party Expenditure Provision's expenditure limitations violated the First Amendment—a charge that it repeated in a counterclaim that said the Colorado Party intended to make other "expenditures directly in connection with" senatorial elections, App. 68, ¶ 48, and attacked the constitutionality of the entire Party Expenditure Provision. The Federal District Court interpreted the provision's words "'in connection with' the general election campaign of a candidate" narrowly, as meaning only expenditures for advertis-

ing using "'express words of advocacy of election or defeat.'" 839 F. Supp. 1448, 1455 (Colo. 1993) (quoting *Buckley*, 424 U. S., at 46, n. 52). See also *Massachusetts Citizens for Life*, 479 U. S., at 249. As so interpreted, the court held, the provision did not cover the expenditures here. The court entered summary judgment for the Colorado Party and dismissed its counterclaim as moot.

Both sides appealed. The Government, for the FEC, argued for a somewhat broader interpretation of the statute— applying the limits to advertisements containing an "electioneering message" about a "clearly identified candidate," FEC Advisory Op. 1985–14, 2 CCH Fed. Election Camp. Fin. Guide ¶ 5819, p. 11,185 (May 30, 1985)—which, it said, both covered the expenditure and satisfied the Constitution. The Court of Appeals agreed. It found the Party Expenditure Provision applicable, held it constitutional, and ordered judgment in the FEC's favor. 59 F. 3d 1015, 1023–1024 (CA10 1995).

We granted certiorari primarily to consider the Colorado Party's argument that the Party Expenditure Provision violates the First Amendment "either facially or as applied." Pet. for Cert. i. For reasons we shall discuss in Part IV, *infra*, we consider only the latter question—whether the Party Expenditure Provision as applied here violates the First Amendment. We conclude that it does.

II

The summary judgment record indicates that the expenditure in question is what this Court in *Buckley* called an "independent" expenditure, not a "coordinated" expenditure that other provisions of FECA treat as a kind of campaign "contribution." See *Buckley, supra*, at 36–37, 46–47, 78; *NCPAC*, 470 U. S., at 498. The record describes how the expenditure was made. In a deposition, the Colorado Party's Chairman, Howard Callaway, pointed out that, at the time of the expenditure, the Party had not yet selected a

senatorial nominee from among the three individuals vying for the nomination. App. 195–196. He added that he arranged for the development of the script at his own initiative, *id.*, at 200, that he, and no one else, approved it, *id.*, at 199, that the only other politically relevant individuals who might have read it were the Party's executive director and political director, *ibid.*, and that all relevant discussions took place at meetings attended only by Party staff, *id.*, at 204.

Notwithstanding the above testimony, the Government argued in District Court—and reiterates in passing in its brief to this Court, Brief for Respondent 27, n. 20—that the deposition showed that the Party had coordinated the advertisement with its candidates. It pointed to Callaway's statement that it was the practice of the Party to "coordinat[e] with the candidate" "campaign strategy," App. 195, and for Callaway to be "as involved as [he] could be" with the individuals seeking the Republican nomination, *ibid.*, by making available to them "all of the assets of the party," *id.*, at 195–196. These latter statements, however, are general descriptions of Party practice. They do not refer to the advertising campaign at issue here or to its preparation. Nor do they conflict with, or cast significant doubt upon, the uncontroverted direct evidence that this advertising campaign was developed by the Colorado Party independently and not pursuant to any general or particular understanding with a candidate. We can find no "genuine" issue of fact in this respect. Fed. Rule Civ. Proc. 56(e); *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 586–587 (1986). And we therefore treat the expenditure, for constitutional purposes, as an "independent" expenditure, not an indirect campaign contribution.

So treated, the expenditure falls within the scope of the Court's precedents that extend First Amendment protection to independent expenditures. Beginning with *Buckley*, the Court's cases have found a "fundamental constitutional difference between money spent to advertise one's views

independently of the candidate's campaign and money contributed to the candidate to be spent on his campaign." *NCPAC, supra,* at 497. This difference has been grounded in the observation that restrictions on contributions impose "only a marginal restriction upon the contributor's ability to engage in free communication," *Buckley, supra,* at 20–21, because the symbolic communicative value of a contribution bears little relation to its size, 424 U. S., at 21, and because such limits leave "persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources," *id.,* at 28. At the same time, reasonable contribution limits directly and materially advance the Government's interest in preventing exchanges of large financial contributions for political favors. *Id.,* at 26–27.

In contrast, the Court has said that restrictions on independent expenditures significantly impair the ability of individuals and groups to engage in direct political advocacy and "represent substantial . . . restraints on the quantity and diversity of political speech." *Id.,* at 19. And at the same time, the Court has concluded that limitations on independent expenditures are less directly related to preventing corruption, since "[t]he absence of prearrangement and coordination of an expenditure with the candidate . . . not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.,* at 47.

Given these established principles, we do not see how a provision that limits a political party's independent expenditures can escape their controlling effect. A political party's independent expression not only reflects its members' views about the philosophical and governmental matters that bind them together, it also seeks to convince others to join those members in a practical democratic task, the task of creating

a government that voters can instruct and hold responsible for subsequent success or failure. The independent expression of a political party's views is "core" First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees. See, *e. g., Eu v. San Francisco County Democratic Central Comm.*, 489 U. S. 214 (1989).

We are not aware of any special dangers of corruption associated with political parties that tip the constitutional balance in a different direction. When this Court considered, and held unconstitutional, limits that FECA had set on certain independent expenditures by PAC's, it reiterated *Buckley*'s observation that "the absence of prearrangement and coordination" does not eliminate, but it does help to "alleviate," any "danger" that a candidate will understand the expenditure as an effort to obtain a *"quid pro quo."* See *NCPAC*, 470 U. S., at 498. The same is true of independent party expenditures.

We recognize that FECA permits individuals to contribute more money ($20,000) to a party than to a candidate ($1,000) or to other political committees ($5,000). 2 U. S. C. § 441a(a). We also recognize that FECA permits unregulated "soft money" contributions to a party for certain activities, such as electing candidates for state office, see § 431(8)(A)(i), or for voter registration and "get out the vote" drives, see § 431(8)(B)(xii). But the opportunity for corruption posed by these greater opportunities for contributions is, at best, attenuated. Unregulated "soft money" contributions may not be used to influence a federal campaign, except when used in the limited, party-building activities specifically designated in the statute. See § 431(8)(B). Any contribution to a party that is earmarked for a particular campaign is considered a contribution to the candidate and is subject to the contribution limitations. § 441a(a)(8). A party may not simply channel unlimited amounts of even undesignated contributions to a candidate, since such direct transfers are

also considered contributions and are subject to the contribution limits on a "multicandidate political committee." § 441a(a)(2). The greatest danger of corruption, therefore, appears to be from the ability of donors to give sums up to $20,000 to a party which may be used for independent party expenditures for the benefit of a particular candidate. We could understand how Congress, were it to conclude that the potential for evasion of the individual contribution limits was a serious matter, might decide to change the statute's limitations on contributions to political parties. Cf. *California Medical Assn.*, 453 U. S., at 197–199 (plurality opinion) (danger of evasion of limits on contribution to candidates justified prophylactic limitation on *contributions* to PAC's). But we do not believe that the risk of corruption present here could justify the "markedly greater burden on basic freedoms caused by" the statute's limitations on *expenditures. Buckley*, 424 U. S., at 44. See also *id.*, at 46–47, 51; *NCPAC, supra*, at 498. Contributors seeking to avoid the effect of the $1,000 contribution limit indirectly by donations to the national party could spend that same amount of money (or more) themselves more directly by making their own independent expenditures promoting the candidate. See *Buckley, supra*, at 44–48 (risk of corruption by individuals' independent expenditures is insufficient to justify limits on such spending). If anything, an independent expenditure made possible by a $20,000 donation, but controlled and directed by a party rather than the donor, would seem less likely to corrupt than the same (or a much larger) independent expenditure made directly by that donor. In any case, the constitutionally significant fact, present equally in both instances, is the lack of coordination between the candidate and the source of the expenditure. See *Buckley, supra*, at 45–46; *NCPAC, supra*, at 498. This fact prevents us from assuming, absent convincing evidence to the contrary, that a limitation on political parties' independent expenditures is

necessary to combat a substantial danger of corruption of the electoral system.

The Government does not point to record evidence or legislative findings suggesting any special corruption problem in respect to independent party expenditures. See *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 664 (1994) ("When the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured" (citation and internal quotation marks omitted)); *NCPAC, supra,* at 498. To the contrary, this Court's opinions suggest that Congress wrote the Party Expenditure Provision not so much because of a special concern about the potentially "corrupting" effect of party expenditures, but rather for the constitutionally insufficient purpose of reducing what it saw as wasteful and excessive campaign spending. See *Buckley, supra,* at 57. In fact, rather than indicating a special fear of the corruptive influence of political parties, the legislative history demonstrates Congress' general desire to enhance what was seen as an important and legitimate role for political parties in American elections. See *Federal Election Comm'n* v. *Democratic Senatorial Campaign Comm.,* 454 U. S., at 41 (Party Expenditure Provision was intended to "assur[e] that political parties will continue to have an important role in federal elections"); S. Rep. No. 93–689, p. 7 (1974) ("[A] vigorous party system is vital to American politics . . . . [P]ooling resources from many small contributors is a legitimate function and an integral part of party politics"); *id.,* at 7–8, 15.

We therefore believe that this Court's prior case law controls the outcome here. We do not see how a Constitution that grants to individuals, candidates, and ordinary political committees the right to make unlimited independent expenditures could deny the same right to political parties. Having concluded this, we need not consider the Party's further claim that the statute's "in connection with" language, and

the FEC's interpretation of that language, are unconstitutionally vague. Cf. *Buckley, supra,* at 40–44.

### III

The Government does not deny the force of the precedent we have discussed. Rather, it argued below, and the lower courts accepted, that the expenditure in this case should be treated under those precedents, not as an "independent expenditure," but rather as a "coordinated expenditure," which those cases have treated as "contributions," and which those cases have held Congress may constitutionally regulate. See, *e. g., Buckley, supra,* at 23–38.

While the District Court found that the expenditure in this case was "coordinated," 839 F. Supp., at 1453, it did not do so based on any factual finding that the Party had consulted with any candidate in the making or planning of the advertising campaign in question. Instead, the District Court accepted the Government's argument that all party expenditures should be treated as if they had been coordinated *as a matter of law,* "[b]ased on Supreme Court precedent and the Commission's interpretation of the statute," *ibid.* The Court of Appeals agreed with this legal conclusion. 59 F. 3d, at 1024. Thus, the lower courts' "finding" of coordination does not conflict with our conclusion, *supra,* at 613–614, that the summary judgment record shows no actual coordination as a matter of fact. The question, instead, is whether the Court of Appeals erred as a legal matter in accepting the Government's conclusive presumption that all party expenditures are "coordinated." We believe it did.

In support of its argument, the Government points to a set of legal materials, based on FEC interpretations, that seem to say or imply that *all* party expenditures are "coordinated." These include: (1) an FEC regulation that forbids political parties to make any "independent expenditures . . . in connection with" a "general election campaign," 11 CFR § 110.7(b)(4) (1995); (2) FEC Advisory Opinions that use the

word "coordinated" to describe the Party Expenditure Provision's limitations, see, *e. g.*, FEC Advisory Op. 1984–15, 1 CCH Fed. Election Camp. Fin. Guide ¶ 5766, p. 11,069 (May 31, 1984) (AO 1984–15); FEC Advisory Op. 1988–22, 2 CCH Fed. Election Camp. Fin. Guide ¶ 5932, p. 11,471, n. 4 (July 5, 1988) (AO 1988–22); (3) one FEC Advisory Opinion that says explicitly in a footnote that "coordination with candidates is presumed and 'independence' precluded," *ibid.*; and (4) a statement by this Court that "[p]arty committees are considered incapable of making 'independent' expenditures," *Democratic Senatorial Campaign Comm., supra*, at 28–29, n. 1.

The Government argues, on the basis of these materials, that the FEC has made an "empirical judgment that party officials will as a matter of course consult with the party's candidates before funding communications intended to influence the outcome of a federal election." Brief for Respondent 27. The FEC materials, however, do not make this empirical judgment. For the most part those materials use the word "coordinated" as a description that does not necessarily deny the possibility that a party could *also* make independent expenditures. See, *e. g.*, AO 1984–15, ¶ 5766, at 11,069. We concede that one Advisory Opinion says, in a footnote, that "coordination with candidates is presumed." AO 1988–22, ¶ 5932, at 11,471, n. 4. But this statement, like the others, appears without any internal or external evidence that the FEC means it to embody an *empirical* judgment (say, that parties, in fact, hardly ever spend money independently) or to represent the outcome of an empirical investigation. Indeed, the statute does not require any such investigation, for it applies *both* to coordinated and to independent expenditures alike. See § 441a(d)(3) (a "political party . . . may not make *any* expenditure" in excess of the limits (emphasis added)). In any event, language in other FEC Advisory Opinions suggests the opposite, namely, that sometimes, in fact, parties do make independent expendi-

tures. See, *e. g.*, AO 1984–15, ¶ 5766, at 11,069 ("Although consultation or coordination with the candidate is permissible, it is not required"). In these circumstances, we cannot take the cited materials as an empirical, or experience-based, determination that, as a factual matter, all party expenditures are coordinated with a candidate. That being so, we need not hold, on the basis of these materials, that the expenditures here were "coordinated."

The Government does not advance any other legal reason that would require us to accept the FEC's characterization. The FEC has not claimed, for example, that, administratively speaking, it is more difficult to separate a political party's "independent," from its "coordinated," expenditures than, say, those of a PAC. Cf. 11 CFR § 109.1 (1995) (distinguishing between independent and coordinated expenditures by other political groups). Nor can the FEC draw significant legal support from the footnote in *Democratic Senatorial Campaign Comm.*, 454 U. S., at 28–29, n. 1, given that this statement was dicta that purported to describe the regulatory regime as the FEC had described it in a brief.

Nor does the fact that the Party Expenditure Provision fails to distinguish between coordinated and independent expenditures indicate a congressional judgment that such a distinction is impossible or untenable in the context of political party spending. Instead, the use of the unmodified term "expenditure" is explained by Congress' desire to limit *all* party expenditures when it passed the 1974 amendments, just as it had limited all expenditures by individuals, corporations, and other political groups. See 18 U. S. C. §§ 608(e), 610 (1970 ed., Supp. IV); *Buckley*, 424 U. S., at 39.

Finally, we recognize that the FEC may have characterized the expenditures as "coordinated" in light of this Court's constitutional decisions prohibiting regulation of most independent expenditures. But, if so, the characterization cannot help the Government prove its case. An agency's simply calling an independent expenditure a "coordinated expendi-

ture" cannot (for constitutional purposes) make it one. See, e. g., *NAACP* v. *Button,* 371 U. S. 415, 429 (1963) (the government "cannot foreclose the exercise of constitutional rights by mere labels"); *Edwards* v. *South Carolina,* 372 U. S. 229, 235–238 (1963) (State may not avoid First Amendment's strictures by applying the label "breach of the peace" to peaceful demonstrations).

The Government also argues that the Colorado Party has conceded that the expenditures are "coordinated." But there is no such concession in respect to the underlying facts. To the contrary, the Party's "Questions Presented" in its petition for certiorari describes the expenditure as one "the party has not coordinated with its candidate." See Pet. for Cert. i. In the lower courts the Party did accept the FEC's terminology, but it did so in the context of legal arguments that did not focus upon the constitutional distinction that we now consider. See Reply Brief for Petitioners 9–10, n. 8 (denying that the FEC's labels can control constitutional analysis). The Government has not referred us to any place where the Party conceded away or abandoned its legal claim that Congress may not limit the uncoordinated expenditure at issue here. And, in any event, we are not bound to decide a matter of constitutional law based on a concession by the particular party before the Court as to the proper legal characterization of the facts. Cf. *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.,* 508 U. S. 439, 447 (1993); *Massachusetts* v. *United States,* 333 U. S. 611, 623–628 (1948); *Young* v. *United States,* 315 U. S. 257, 259 (1942) (recognizing that "our judgments are precedents" and that the proper understanding of matters of law "cannot be left merely to the stipulation of parties").

Finally, the Government and supporting *amici* argue that the expenditure is "coordinated" because a party and its candidate are identical, *i. e.,* the party, in a sense, "is" its candidates. We cannot assume, however, that this is so. See, e. g., W. Keefe, Parties, Politics, and Public Policy in America

59–74 (5th ed. 1988) (describing parties as "coalitions" of differing interests). Congress chose to treat candidates and their parties quite differently under the Act, for example, by regulating contributions from one to the other. See § 441a(a)(2)(B). See also 11 CFR §§ 110.2, 110.3(b) (1995). And we are not certain whether a metaphysical identity would help the Government, for in that case one might argue that the absolute identity of views and interests eliminates any potential for corruption, as would seem to be the case in the relationship between candidates and their campaign committees. Cf. *Buckley, supra,* at 54–59 (Congress may not limit expenditures by candidate/campaign committee); *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 790 (1978) (where there is no risk of "corruption" of a candidate, the Government may not limit even contributions).

## IV

The Colorado Party and supporting *amici* have argued a broader question than we have decided, for they have claimed that, in the special case of political parties, the First Amendment forbids congressional efforts to limit coordinated expenditures as well as independent expenditures. Because the expenditure before us is an independent expenditure we have not reached this broader question in deciding the Party's "as applied" challenge.

We recognize that the Party filed a counterclaim in which it sought to raise a facial challenge to the Party Expenditure Provision as a whole. But that counterclaim did not focus specifically upon coordinated expenditures. See App. 68–69. Nor did its summary judgment affidavits specifically allege that the Party intended to make coordinated expenditures exceeding the statute's limits. See *id.,* at 159, ¶ 4. While this lack of focus does not deprive this Court of jurisdiction to consider a facial challenge to the Party Expenditure Provision as overbroad or as unconstitutional in all applications, it does provide a prudential reason for this Court not to

decide the broader question, especially since it may not be necessary to resolve the entire current dispute. If, in fact, the Party wants to make only independent expenditures like those before us, its counterclaim is mooted by our resolution of its "as applied" challenge. Cf. *Renne* v. *Geary*, 501 U. S. 312, 323–324 (1991) (facial challenge should generally not be entertained when an "as-applied" challenge could resolve the case); *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 503–504 (1985).

More importantly, the opinions of the lower courts, and the parties' briefs in this case, did not squarely isolate, and address, party expenditures that *in fact* are coordinated, nor did they examine, in that context, relevant similarities or differences with similar expenditures made by individuals or other political groups. Indeed, to our knowledge, this is the first case in the 20-year history of the Party Expenditure Provision to suggest that in-fact coordinated expenditures by political parties are protected from congressional regulation by the First Amendment, even though this Court's prior cases have permitted regulation of similarly coordinated expenditures by individuals and other political groups. See *Buckley*, 424 U. S., at 46–47. This issue is complex. As JUSTICE KENNEDY points out, *post*, at 629–630, party coordinated expenditures do share some of the constitutionally relevant features of independent expenditures. But many such expenditures are also virtually indistinguishable from simple contributions (compare, for example, a donation of money with direct payment of a candidate's media bills, see *Buckley*, *supra*, at 46). Moreover, political parties also share relevant features with many PAC's, both having an interest in, and devoting resources to, the goal of electing candidates who will "work to further" a particular "political agenda," which activity would benefit from coordination with those candidates. *Post*, at 630. See, *e. g.*, *NCPAC*, 470 U. S., at 490 (describing the purpose and activities of the National Conservative PAC); *id.*, at 492 (coordinated expenditures by PAC's are

subject to FECA contribution limitations). Thus, a holding on in-fact coordinated party expenditures necessarily implicates a broader range of issues than may first appear, including the constitutionality of party contribution limits.

But the focus of this litigation, and of the lower court opinions, has not been on such issues, but rather on whether the Government may conclusively deem independent party expenditures to be coordinated. This lack of focus may reflect, in part, the litigation strategy of the parties. The Government has denied that any distinction can be made between a party's independent and its coordinated expenditures. The Colorado Party, for its part, did not challenge a different provision of the statute—a provision that imposes a $5,000 limit on any contribution by a "multicandidate political committee" (including a coordinated expenditure) and which would apply to party coordinated expenditures if the entire Party Expenditure Provision were struck from the statute as unconstitutional. See §§ 441a(a)(2), (4), (7)(B)(i). Rather than challenging the constitutionality of this provision as well, thereby making clear that it was challenging Congress' authority to regulate in-fact coordinated party expenditures, the Party has made an obscure severability argument that would leave party coordinated expenditures exempt from that provision. See Reply Brief for Petitioners 11, n. 9. While these strategies do not deprive the parties of a right to adjudicate the counterclaim, they do provide a reason for this Court to defer consideration of the broader issues until the lower courts have reconsidered the question in light of our current opinion.

Finally, we note that neither the parties nor the lower courts have considered whether or not Congress would have wanted the Party Expenditure Provision's limitations to stand were they to apply only to coordinated, and not to independent, expenditures. See *Buckley, supra,* at 108; *NCPAC, supra,* at 498. This nonconstitutional ground for exempting party coordinated expenditures from FECA limitations

should be briefed and considered before addressing the constitutionality of such regulation. See *United States* v. *Locke*, 471 U. S. 84, 92, and n. 9 (1985).

JUSTICE THOMAS disagrees and would reach the broader constitutional question notwithstanding the above prudential considerations. In fact, he would reach a great number of issues neither addressed below, nor presented by the facts of this case, nor raised by the parties, for he believes it appropriate here to overrule *sua sponte* this Court's entire campaign finance jurisprudence, developed in numerous cases over the last 20 years. See *post*, at 635–644. Doing so seems inconsistent with this Court's view that it is ordinarily "inappropriate for us to reexamine" prior precedent "without the benefit of the parties' briefing," since the "principles that animate our policy of *stare decisis* caution against overruling a longstanding precedent on a theory not argued by the parties." *United States* v. *International Business Machines Corp.*, 517 U. S. 843, 855, 856 (1996). In our view, given the important competing interests involved in campaign finance issues, we should proceed cautiously, consistent with this precedent, and remand for further proceedings.

For these reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, concurring in the judgment and dissenting in part.

In agreement with JUSTICE THOMAS, *post*, at 631–634, I would hold that the Colorado Republican Party (Party), in its pleadings in the District Court and throughout this litigation, has preserved its claim that the constraints imposed by the Federal Election Campaign Act of 1971 (FECA), both on its face and as interpreted by the Federal Elections Commission (FEC), violate the First Amendment.

In the principal opinion's view, the FEC's conclusive presumption that all political party spending relating to identified candidates is "coordinated" cannot be squared with the First Amendment. *Ante,* at 619–623. The principal opinion finds the presumption invalid, and I agree with much of the reasoning behind that conclusion. The quarrel over the FEC's presumption is beside the point, however, for under the statute it is both burdensome and quite unrealistic for a political party to attempt the expenditure of funds on a candidate's behalf (or against other candidates) without running afoul of FECA's spending limitations.

Indeed, the principal opinion's reasoning with respect to the presumption illuminates the deficiencies in the statutory provision as a whole as it constrains the speech and political activities of political parties. The presumption is a logical, though invalid, implementation of the statute, which restricts as a "contribution" a political party's spending "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 2 U. S. C. § 441a(a)(7)(B)(i). While the statutory provision applies to any "person," its obvious purpose and effect when applied to political parties, as the FEC's presumption reflects, is to restrict any party's spending in a specific campaign for or against a candidate and so to burden a party in expending its own money for its own speech.

The central holding in *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam)*, is that spending money on one's own speech must be permitted, *id.,* at 44–58, and this is what political parties do when they make the expenditures FECA restricts. FECA calls spending of this nature a "contribution," § 441a(a)(7)(B)(i), and it is true that contributions can be restricted consistent with *Buckley, supra,* at 23–38. As the principal opinion acknowledges, however, and as our cases hold, we cannot allow the Government's suggested labels to control our First Amendment analysis. *Ante,* at

621–622. See also, *e. g., Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829, 843 (1978) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake"). In *Buckley,* we concluded that contribution limitations imposed only "marginal restriction[s]" on the contributor's First Amendment rights, 424 U. S., at 20, because certain attributes of contributions make them less like "speech" for First Amendment purposes:

> "A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." *Id.,* at 21 (footnote omitted).

We had no occasion in *Buckley* to consider possible First Amendment objections to limitations on spending by parties. *Id.,* at 58, n. 66. While our cases uphold contribution limitations on individuals and associations, see *id.,* at 23–38; *California Medical Assn.* v. *Federal Election Comm'n,* 453 U. S. 182, 193–199 (1981) (plurality opinion), political party spending "in cooperation, consultation, or concert with" a candi-

date does not fit within our description of "contributions" in *Buckley*. In my view, we should not transplant the reasoning of cases upholding ordinary contribution limitations to a case involving FECA's restrictions on political party spending.

The First Amendment embodies a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964). Political parties have a unique role in serving this principle; they exist to advance their members' shared political beliefs. See, *e. g.*, *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214 (1989); *Sweezy* v. *New Hampshire*, 354 U. S. 234, 250 (1957). Cf. *Morse* v. *Republican Party of Va.*, 517 U. S. 186, 250–251 (1996) (KENNEDY, J., dissenting). A party performs this function, in part, by "identify[ing] the people who constitute the association, and . . . limit[ing] the association to those people only." *Democratic Party of United States* v. *Wisconsin ex rel. La Follette*, 450 U. S. 107, 122 (1981). Having identified its members, however, a party can give effect to their views only by selecting and supporting candidates. A political party has its own traditions and principles that transcend the interests of individual candidates and campaigns; but in the context of particular elections, candidates are necessary to make the party's message known and effective, and vice versa.

It makes no sense, therefore, to ask, as FECA does, whether a party's spending is made "in cooperation, consultation, or concert with" its candidate. The answer in most cases will be yes, but that provides more, not less, justification for holding unconstitutional the statute's attempt to control this type of party spending, which bears little resemblance to the contributions discussed in *Buckley*. *Supra*, at 627–628 and this page. Party spending "in cooperation, consultation, or concert with" its candidates of necessity "communicate[s] the underlying basis for the support," 424 U. S., at 21, *i. e.*, the hope

that he or she will be elected and will work to further the party's political agenda.

The problem is not just the absence of a basis in our First Amendment cases for treating the party's spending as contributions. The greater difficulty posed by the statute is its stifling effect on the ability of the party to do what it exists to do. It is fanciful to suppose that limiting party spending of the type at issue here "does not in any way infringe the contributor's freedom to discuss candidates and issues," *ibid.*, since it would be impractical and imprudent, to say the least, for a party to support its own candidates without some form of "cooperation" or "consultation." The party's speech, legitimate on its own behalf, cannot be separated from speech on the candidate's behalf without constraining the party in advocating its most essential positions and pursuing its most basic goals. The party's form of organization and the fact that its fate in an election is inextricably intertwined with that of its candidates cannot provide a basis for the restrictions imposed here. See *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U. S. 480, 494–495 (1985).

We have a constitutional tradition of political parties and their candidates engaging in joint First Amendment activity; we also have a practical identity of interests between the two entities during an election. Party spending "in cooperation, consultation, or concert with" a candidate therefore is indistinguishable in substance from expenditures by the candidate or his campaign committee. We held in *Buckley* that the First Amendment does not permit regulation of the latter, see 424 U. S., at 54–59, and it should not permit this regulation of the former. Congress may have authority, consistent with the First Amendment, to restrict undifferentiated political party contributions which satisfy the constitutional criteria we discussed in *Buckley*, but that type of regulation is not at issue here.

I would resolve the Party's First Amendment claim in accord with these principles rather than remit the Party to further protracted proceedings. Because the principal opinion would do otherwise, I concur only in the judgment.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join as to Parts I and III, concurring in the judgment and dissenting in part.

I agree that petitioners' rights under the First Amendment have been violated, but I think we should reach the facial challenge in this case in order to make clear the circumstances under which political parties may engage in political speech without running afoul of 2 U. S. C. § 441a(d)(3). In resolving that challenge, I would reject the framework established by *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, for analyzing the constitutionality of campaign finance laws and hold that § 441a(d)(3)'s limits on independent and coordinated expenditures fail strict scrutiny. But even under *Buckley*, § 441a(d)(3) cannot stand, because the anticorruption rationale that we have relied upon in sustaining other campaign finance laws is inapplicable where political parties are the subject of such regulation.

I

As an initial matter, I write to make clear that we should decide the Colorado Republican Party's (Party's) facial challenge to § 441a(d)(3) and thus address the constitutionality of limits on coordinated expenditures by political parties. JUSTICE BREYER's reasons for not reaching the facial constitutionality of the statute are unpersuasive. In addition, concerns for the chilling of First Amendment expression counsel in favor of resolving that question.

After the Federal Election Commission (FEC) brought this action against the Party, the Party counterclaimed that "the limits on its expenditures in connection with the general

election campaign for the Office of United States Senator from the State of Colorado imposed by 2 U.S.C. § 441a(d) are unconstitutional, both facially and as applied." App. 68. Though JUSTICE BREYER faults the Party for not "focus[ing] specifically upon coordinated expenditures," *ante,* at 623, the term "expenditures" certainly includes both coordinated as well as independent expenditures.[1] See 2 U.S.C. § 431(9)(A) ("The term 'expenditure' includes . . . *any* purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office" (emphasis added)). Moreover, at the time the Party filed its counterclaim, all party expenditures were treated by law as coordinated, see *Federal Election Comm'n* v. *Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 28–29, n. 1 (1981), so a reference to expenditures by a party was tantamount to a reference to coordinated expenditures.

Given the liberal nature of the rules governing civil pleading, see Fed. Rule Civ. Proc. 8, the Party's straightforward allegation of the unconstitutionality of § 441a(d)(3)'s expenditure limits clearly suffices to raise the claim that neither independent nor coordinated expenditures may be regulated consistently with the First Amendment. Indeed, that is precisely how the Court of Appeals appears to have read the counterclaim. The court expressly said that it was "analyzing the constitutionality of limits on coordinated expenditures by political committees," 59 F. 3d 1015, 1024 (CA10 1995), under § 441a(d)(3).

For the same reasons, the fact that the Party's summary judgment affidavits did not "specifically allege," *ante,* at 623, that the Party intended to make coordinated expenditures is also immaterial. The affidavits made clear that, but for

---

[1] JUSTICE BREYER acknowledges as much when he asserts earlier in his opinion that "the unmodified term 'expenditure'" reflects a congressional intent "to limit *all* party expenditures." *Ante,* at 621 (emphasis in original).

§ 441a(d)(3), the Party would spend in excess of the limits imposed by that statute, see App. 159 ("[T]he State Party intends to pay for communications within the spending limits of [§ 441]. . . . However, the State Party would also like to pay for communications which costs [sic] exceed the spending limits of [§ 441a(d)], but will not do so due to the deterrent and chilling effect of the statute"), as did the Party's brief in this Court, see Brief for Petitioners 23–24 ("The Colorado Party is ready, willing and able to make expenditures expressly advocating the election or defeat of candidates for federal office that would exceed the limits imposed by § 441a(d), but it has been deterred from doing so by the obvious and credible threat of FEC enforcement actions").

Finally, though JUSTICE BREYER notes that this is the first Federal Election Campaign Act of 1971 (FECA) case to raise the constitutional validity of limits on coordinated expenditures, see *ante*, at 624, that is, at best, an argument against granting certiorari. It is too late for arguments like that now. The case is here, and we needlessly protract this litigation by remanding this important issue to the Court of Appeals. Nor is the fact that the "issue is complex," *ibid.*, a good reason for avoiding it. We do not sit to decide only easy cases. And while it may be true that no court has ever asked whether expenditures that are *"in fact"* coordinated may be regulated under the First Amendment, see *ibid.*, I do not see how the existence of an "in fact" coordinated expenditure would change our analysis of the facial constitutionality of § 441a(d)(3), since courts in facial challenges under the First Amendment routinely consider applications of the relevant statute other than the application before the court. See *Broadrick* v. *Oklahoma,* 413 U. S. 601, 612 (1973). Whether or not there are facts in the record to support the finding that this particular expenditure was actually coordinated with a candidate, we are not, contrary to the suggestion of JUSTICE BREYER, incapable of considering the Government's interest in regulating such expenditures

and testing the fit between that end and the means used to achieve it.[2]

The validity of § 441a(d)(3)'s controls on coordinated expenditures is an open question that, if left unanswered, will inhibit the exercise of legitimate First Amendment activity nationwide. All JUSTICE BREYER resolves is that when a political party spends money in support of a candidate (or against his opponent) and the Government cannot thereafter prove any coordination between the party and the candidate, the party cannot be punished by the Government for that spending. This settles little, if anything. Parties are left to wonder whether their speech is protected by the First Amendment when the Government can show—presumably with circumstantial evidence—a link between the party and the candidate with respect to the speech in question. And of course, one of the main purposes of a political party is to support its candidates in elections.

The constitutionality of limits on coordinated expenditures by political parties is squarely before us. We should address this important question now, instead of leaving political parties in a state of uncertainty about the types of First Amendment expression in which they are free to engage.

---

[2] JUSTICE BREYER's remaining arguments for avoiding the facial challenge are straw men. See ante, at 625 (if § 441a(d)(3) were invalidated in its entirety, other FECA provisions that the Party has not challenged might apply to coordinated party expenditures); ibid. (if § 441a(d)(3) were upheld as to coordinated expenditures but invalidated as to independent expenditures, issues of severability would be raised). That resolution of the primary question in this case (the constitutionality of § 441a(d)(3) with respect to all expenditures) might generate issues not previously considered (such as severability) is no reason for not deciding the question itself. Without suggesting that remand is the only appropriate way to deal with possible corollary matters in this case or that these arguments have merit, I point out that we can, of course, decide the central question without ruling on the issues that concern JUSTICE BREYER.

## II

## A

Critical to JUSTICE BREYER's reasoning is the distinction between contributions[3] and independent expenditures that we first drew in *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*. Though we said in *Buckley* that controls on spending and giving "operate in an area of the most fundamental First Amendment activities," *id.*, at 14, we invalidated the expenditure limits of FECA and upheld the Act's contribution limits. The justification we gave for the differing results was this: "The expenditure limitations . . . represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech," *id.*, at 19, whereas "limitation[s] upon the amount that any one person or group may contribute to a candidate or political committee entai[l] only a marginal restriction upon the contributor's ability to engage in free communication," *id.*, at 20–21. This conclusion was supported mainly by two assertions about the nature of contributions: First, though contributions may result in speech, that speech is by the candidate and not by the contributor; and second, contributions express only general support for the candidate but do not communicate the reasons for that support. *Id.*, at 21. Since *Buckley*, our campaign finance jurisprudence has been based in large part on this distinction between contributions and expenditures. See, *e. g., Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc. (MCFL)*, 479 U. S. 238, 259–260, 261–262 (1986); *Federal Election Comm'n* v. *National Conservative Political Action Comm. (NCPAC)*, 470 U. S. 480, 497 (1985);

---

[3] Coordinated expenditures are by statute categorized as contributions. See 2 U. S. C. § 441a(a)(7)(B)(i) ("[E]xpenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate").

*California Medical Assn.* v. *Federal Election Comm'n*, 453 U. S. 182, 196 (1981) (plurality opinion).

In my view, the distinction lacks constitutional significance, and I would not adhere to it. As Chief Justice Burger put it: "[C]ontributions and expenditures are two sides of the same First Amendment coin." *Buckley* v. *Valeo*, 424 U. S., at 241 (concurring in part and dissenting in part).[4] Contributions and expenditures both involve core First Amendment expression because they further the "[d]iscussion of public issues and debate on the qualifications of candidates . . . integral to the operation of the system of government established by our Constitution." *Id.*, at 14. When an individual donates money to a candidate or to a partisan organization, he enhances the donee's ability to communicate a message and thereby adds to political debate, just as when that individual communicates the message himself. Indeed, the individual may add more to political discourse by giving rather than spending, if the donee is able to put the funds to more productive use than can the individual. The contribution of funds to a candidate or to a political group thus fosters the "free discussion of governmental affairs," *Mills* v. *Alabama*, 384 U. S. 214, 218 (1966), just as an expenditure does.[5]

---

[4] Three Members of the *Buckley* Court thought the distinction untenable at the time, see 424 U. S., at 241 (Burger, C. J., concurring in part and dissenting in part); *id.*, at 261 (White, J., concurring in part and dissenting in part); *id.*, at 290 (Blackmun, J., concurring in part and dissenting in part), and another Member disavowed it subsequently, see *Federal Election Comm'n* v. *NCPAC*, 470 U. S. 480, 518–521 (1985) (Marshall, J., dissenting). Cf. *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, 678 (1990) (STEVENS, J., concurring) (stating that distinction "should have little, if any, weight in reviewing corporate participation in candidate elections").

[5] See H. Alexander, Money in Politics 234 (1972): "The constitutional arguments against limiting campaign spending also apply against limiting contributions; specifically, it is the right of an individual to spend his money to support a congenial viewpoint . . . . Some views are heard only if interested individuals are willing to support financially the candidate or committee voicing the position. To be widely heard, mass communica-

Giving and spending in the electoral process also involve basic associational rights under the First Amendment. See BeVier, Money and Politics: A Perspective on the First Amendment and Campaign Finance Reform, 73 Calif. L. Rev. 1045, 1064 (1985) (hereinafter BeVier). As we acknowledged in *Buckley,* " '[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.' " 424 U. S., at 15 (quoting *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460 (1958)). Political associations allow citizens to pool their resources and make their advocacy more effective, and such efforts are fully protected by the First Amendment. *Federal Election Comm'n* v. *NCPAC, supra,* at 494. If an individual is limited in the amount of resources he can contribute to the pool, he is most certainly limited in his ability to associate for purposes of effective advocacy. See *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley,* 454 U. S. 290, 296 (1981) ("To place a . . . limit . . . on individuals wishing to band together to advance their views . . . is clearly a restraint on the right of association"). And if an individual cannot be subject to such limits, neither can political associations be limited in their ability to give as a means of furthering their members' viewpoints. As we have said, "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250 (1957) (plurality opinion).[6]

---

tions may be necessary, and they are costly. By extension, then, the contribution of money is a contribution to freedom of political debate."

[6] To illustrate the point that giving and spending in the political process implicate the same First Amendment values, I note that virtually everything JUSTICE BREYER says about the importance of free independent expenditures applies with equal force to coordinated expenditures and contributions. For instance, JUSTICE BREYER states that "[a] political party's independent expression not only reflects its members' views about the philosophical and governmental matters that bind them together, it also seeks to convince others to join those members in a practical democratic

Turning from similarities to differences, I can discern only one potentially meaningful distinction between contributions and expenditures. In the former case, the funds pass through an intermediary—some individual or entity responsible for organizing and facilitating the dissemination of the message—whereas in the latter case they may not necessarily do so. But the practical judgment by a citizen that another person or an organization can more effectively deploy funds for the good of a common cause than he can ought not deprive that citizen of his First Amendment rights. Whether an individual donates money to a candidate or group who will use it to promote the candidate or whether the individual spends the money to promote the candidate himself, the individual seeks to engage in political expression and to associate with like-minded persons. A contribution is simply an indirect expenditure; though contributions and expenditures may thus differ in form, they do not differ in substance. As one commentator cautioned, "let us not lose sight of the speech." Powe, Mass Speech and the Newer First Amendment, 1982 S. Ct. Rev. 243, 258.

Echoing the suggestion in *Buckley* that contributions have less First Amendment value than expenditures because they do not involve speech by the donor, see 424 U. S., at 21, the Court has sometimes rationalized limitations on contributions by referring to contributions as "speech by proxy." See, *e. g., California Medical Assn.* v. *Federal Election Comm'n*, 453 U. S., at 196 (Marshall, J.) (plurality opinion). The "speech by proxy" label is, however, an ineffective tool for distinguishing contributions from expenditures. Even in the case of a direct expenditure, there is usually some go-

---

task, the task of creating a government that voters can instruct and hold responsible for subsequent success or failure." *Ante,* at 615–616. "Coordinated" expression by political parties, of course, shares those precise attributes. The fact that an expenditure is prearranged with the candidate—presumably to make it more effective in the election—does not take away from its fundamental democratic purposes.

between that facilitates the dissemination of the spender's message—for instance, an advertising agency or a television station. See Powe, *supra*, at 258–259. To call a contribution "speech by proxy" thus does little to differentiate it from an expenditure. See *Buckley* v. *Valeo, supra*, at 243–244, and n. 7 (Burger, C. J., concurring in part and dissenting in part). The only possible difference is that contributions involve an extra step in the proxy chain. But again, that is a difference in form, not substance.

Moreover, we have recently recognized that where the "proxy" speech is endorsed by those who give, that speech is a fully protected exercise of the donors' associational rights. In *Federal Election Comm'n* v. *NCPAC*, we explained:

> "[T]he 'proxy speech' approach is not useful . . . [where] the contributors obviously like the message they are hearing from [the] organizatio[n] and want to add their voices to that message; otherwise they would not part with their money. To say that their collective action in pooling their resources to amplify their voices is not entitled to full First Amendment protection would subordinate the voices of those of modest means as opposed to those sufficiently wealthy to be able to buy expensive media ads with their own resources." 470 U. S., at 495.

The other justification in *Buckley* for the proposition that contribution caps only marginally restrict speech—that is, that a contribution signals only general support for the candidate but indicates nothing about the reasons for that support—is similarly unsatisfying. Assuming the assertion is descriptively accurate (which is certainly questionable), it still cannot mean that giving is less important than spending in terms of the First Amendment. A campaign poster that reads simply "We support candidate Smith" does not seem to me any less deserving of constitutional protection than one that reads "We support candidate Smith because we like

his position on agriculture subsidies." Both express a political opinion. Even a pure message of support, unadorned with reasons, is valuable to the democratic process.

In sum, unlike the *Buckley* Court, I believe that contribution limits infringe as directly and as seriously upon freedom of political expression and association as do expenditure limits. The protections of the First Amendment do not depend upon so fine a line as that between spending money to support a candidate or group and giving money to the candidate or group to spend for the same purpose. In principle, people and groups give money to candidates and other groups for the same reason that they spend money in support of those candidates and groups: because they share social, economic, and political beliefs and seek to have those beliefs affect governmental policy. I think that the *Buckley* framework for analyzing the constitutionality of campaign finance laws is deeply flawed. Accordingly, I would not employ it, as JUSTICE BREYER and JUSTICE KENNEDY do.

## B

Instead, I begin with the premise that there is no constitutionally significant difference between campaign contributions and expenditures: Both forms of speech are central to the First Amendment. Curbs on protected speech, we have repeatedly said, must be strictly scrutinized. See *Federal Election Comm'n* v. *NCPAC, supra,* at 501; *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley,* 454 U. S., at 294; *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 786 (1978).[7] I am convinced that under tradi-

---

[7] In *Buckley* v. *Valeo,* 424 U. S. 1 (1976), the Court purported to scrutinize strictly the contribution provisions as well as the expenditure rules. See *id.,* at 23 (FECA's contribution and expenditures limits "both implicate fundamental First Amendment interests"); *id.,* at 25 (contribution limits, like expenditure limits, are "'subject to the closest scrutiny'" (citation omitted)). It has not gone unnoticed, however, that we seemed more forgiving in our review of the contribution provisions than of the expenditure rules. See, *e. g., California Medical Assn.* v. *Federal Election Comm'n,*

tional strict scrutiny, broad prophylactic caps on both spending and giving in the political process, like § 441a(d)(3), are unconstitutional.

The formula for strict scrutiny is, of course, well established. It requires both a compelling governmental interest and legislative means narrowly tailored to serve that interest. In the context of campaign finance reform, the only governmental interest that we have accepted as compelling is the prevention of corruption or the appearance of corruption, see *Federal Election Comm'n v. NCPAC*, 470 U. S., at 496–497, and we have narrowly defined "corruption" as a "financial *quid pro quo:* dollars for political favors," *id.*, at 497.[8] As for the means-ends fit under strict scrutiny, we have specified that "[w]here at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation." *Federal Election Comm'n v. MCFL*, 479 U. S., at 265.

In *Buckley*, we expressly stated that the means adopted must be "closely drawn to avoid unnecessary abridgment" of First Amendment rights. 424 U. S., at 25. But the *Buckley* Court summarily rejected the argument that, because less restrictive means of preventing corruption existed—for instance, bribery laws and disclosure requirements—FECA's contribution provisions were invalid. Bribery laws, the Court said, "deal with only the most blatant and specific attempts of those with money to influence governmental action," *id.*, at 28, suggesting that those means were inade-

---

453 U. S. 182, 196 (1981) (plurality opinion) (contributions are "not the sort of political advocacy that this Court in *Buckley* found entitled to full First Amendment protection"). But see *id.*, at 201–202 (Blackmun, J., concurring in part and concurring in judgment) (under *Buckley*, there is no lesser standard of review for contributions as opposed to expenditures).

[8] As I explain in Part III, *infra*, the interest in preventing corruption is inapplicable when the subject of the regulation is a political party. My analysis here is more general, however, and applies to all individuals and entities subject to campaign finance limits.

quate to serve the governmental interest. With respect to disclosure rules, the Court admitted that they serve "many salutary purposes" but said that Congress was "entitled to conclude that disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant." *Ibid.* Finally, the Court noted that contribution caps leave people free to engage in independent political speech, to volunteer their services, and to contribute money to a "limited but nonetheless substantial extent." *Ibid.*

In my opinion, FECA's monetary caps fail the narrow tailoring test. Addressing the constitutionality of FECA's contribution caps, the *Buckley* appellants argued:

> "If a small minority of political contributions are given to secure appointments for the donors or some other *quid pro quo*, that cannot serve to justify prohibiting all large contributions, the vast majority of which are given not for any such purpose but to further the expression of political views which the candidate and donor share. Where First Amendment rights are involved, a blunderbuss approach which prohibits mostly innocent speech cannot be held a means narrowly and precisely directed to the governmental interest in the small minority of contributions that are not innocent." Brief for Appellants in *Buckley* v. *Valeo*, O. T. 1975, Nos. 75–436 and 75–437, pp. 117–118.

The *Buckley* appellants were, to my mind, correct. Broad prophylactic bans on campaign expenditures and contributions are not designed with the precision required by the First Amendment because they sweep protected speech within their prohibitions.

Section 441a(d)(3), in particular, suffers from this infirmity. It flatly bans all expenditures by all national and state party committees in excess of certain dollar limits, without any evidence that covered committees who exceed those limits are in fact engaging, or likely to engage, in bribery or any-

thing resembling it. See *Austin* v. *Michigan Chamber of Commerce,* 494 U. S. 652, 689 (1990) (SCALIA, J., dissenting) (where statute "extends to speech that has the mere *potential* for producing social harm" it should not be held to satisfy the narrow tailoring requirement (emphasis in original)). Thus, the statute indiscriminately covers the many conceivable instances in which a party committee could exceed the spending limits without any intent to extract an unlawful commitment from a candidate. Cf. *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 637 (1980) (State may not, in effort to stop fraud in charitable solicitations, "lump" truly charitable organizations "with those that in fact are using the charitable label as a cloak for profitmaking and refuse to employ more precise measures to separate one kind from the other"). As one commentator has observed: "[I]t must not be forgotten that a large number of contributions are made without any hope of specific gain: for the promotion of a program, because of enthusiasm for a candidate, or to promote what the giver vaguely conceives to be the national interest." L. Overacker, Money in Elections 192 (1974).

In contrast, federal bribery laws are designed to punish and deter the corrupt conduct the Government seeks to prevent under FECA, and disclosure laws work to make donors and donees accountable to the public for any questionable financial dealings in which they may engage. Cf. *Schaumburg* v. *Citizens for a Better Environment, supra,* at 637–638 (explaining that "less intrusive" means of preventing fraud in charitable solicitation are "the penal laws [that can be] used to punish such conduct directly" and "disclosure of the finances of charitable organizations"). In light of these alternatives, wholesale limitations that cover contributions having nothing to do with bribery—but with speech central to the First Amendment—are not narrowly tailored.

*Buckley*'s rationale for the contrary conclusion, see *supra,* at 641–642, is faulty. That bribery laws are not completely effective in stamping out corruption is no justification for the

conclusion that prophylactic controls on funding activity are narrowly tailored. The First Amendment limits Congress to legislative measures that do not abridge the Amendment's guaranteed freedoms, thereby constraining Congress' ability to accomplish certain goals. Similarly, that other modes of expression remain open to regulated individuals or groups does not mean that a statute is the least restrictive means of addressing a particular social problem. A statute could, of course, be more restrictive than necessary while still leaving open some avenues for speech.[9]

## III

Were I convinced that the *Buckley* framework rested on a principled distinction between contributions and expenditures, which I am not, I would nevertheless conclude that §441a(d)(3)'s limits on political parties violate the First Amendment. Under *Buckley* and its progeny, a substantial threat of corruption must exist before a law purportedly

---

[9] JUSTICE STEVENS submits that we should "accord special deference to [Congress'] judgment on questions related to the extent and nature of limits on campaign spending," *post*, at 650, a stance that the Court of Appeals also adopted, see 59 F. 3d 1015, 1024 (CA10 1995). This position poses great risk to the First Amendment, in that it amounts to letting the fox stand watch over the henhouse. There is good reason to think that campaign *reform* is an especially inappropriate area for judicial deference to legislative judgment. See generally BeVier 1074–1081. What the argument for deference fails to acknowledge is the potential for legislators to set the rules of the electoral game so as to keep themselves in power and to keep potential challengers out of it. See *id.*, at 1075 ("'Courts must police inhibitions on . . . political activity because we cannot trust elected officials to do so'" (emphasis deleted)) (quoting J. Ely, Democracy and Distrust 106 (1980)). See also R. Winter, Political Financing and the Constitution, 486 Annals Am. Acad. Pol. & Soc. Sci. 34, 40, 48 (1986). Indeed, history demonstrates that the most significant effect of election reform has been not to purify public service, but to protect incumbents and increase the influence of special interest groups. See BeVier 1078–1080. When Congress seeks to ration political expression in the electoral process, we ought not simply acquiesce in its judgment.

aimed at the prevention of corruption will be sustained against First Amendment attack.[10] Just as some of the monetary limits in the *Buckley* line of cases were held to be invalid because the Government interest in stemming corruption was inadequate under the circumstances to justify the restrictions on speech, so too is § 441a(d)(3) invalid.[11]

The Government asserts that the purpose of § 441a(d)(3) is to prevent the corruption of candidates and elected representatives by party officials. The Government does not explain precisely what it means by "corruption," however;[12] the closest thing to an explanation the Government offers is that "corruption" is "'the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office.'" Brief for Respondent 35 (quoting *Buckley* v. *Valeo*, 424 U. S., at 25). We so defined

---

[10] See *Buckley* v. *Valeo*, 424 U. S., at 45–47 (striking down limits on independent expenditures because the "advocacy restricted by the provision does not presently appear to pose dangers of real or apparent corruption"); *Federal Election Comm'n* v. *MCFL*, 479 U. S. 238, 263 (1986) (invalidating caps on campaign expenditures by incorporated political associations because spending by such groups "does not pose [any] threat" of corruption); *Federal Election Comm'n* v. *NCPAC*, 470 U. S., at 498 (striking down limits on independent expenditures by political action committees because "a *quid pro quo* for improper commitments" in that context was a "hypothetical possibility"); *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 297 (1981) (stating that "*Buckley* does not support limitations on contributions to committees formed to favor or oppose *ballot measures*" because anticorruption rationale is inapplicable); *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 790 (1978) (concluding that limits on referendum speech by corporations violate First Amendment because "[t]he risk of corruption . . . simply is not present").

[11] While JUSTICE BREYER chides me for taking the position that I would not adhere to *Buckley*, see *ante*, at 626, and suggests that my approach to this case is thus insufficiently "cautiou[s]," *ibid.*, he ignores this Part of my opinion, in which I explain why limits on coordinated expenditures are unconstitutional *even under the* Buckley *line of precedent*.

[12] Nor, for that matter, does JUSTICE BREYER explain what sorts of *quid pro quos* a party could extract from a candidate. Cf. *ante*, at 615.

corruption in *Buckley* for purposes of reviewing ceilings on giving or spending by individuals, groups, political committees, and candidates. See *id.*, at 23, 35, 39. But we did not in that case consider the First Amendment status of FECA's provisions dealing with political parties. See *id.*, at 58, n. 66, 59, n. 67.

As applied in the specific context of campaign funding by political parties, the anticorruption rationale loses its force. See Nahra, Political Parties and the Campaign Finance Laws: Dilemmas, Concerns and Opportunities, 56 Ford. L. Rev. 53, 105–106 (1987). What could it mean for a party to "corrupt" its candidate or to exercise "coercive" influence over him? The very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes. When political parties achieve that aim, that achievement does not, in my view, constitute "a subversion of the political process." *Federal Election Comm'n* v. *NCPAC*, 470 U. S., at 497. For instance, if the Democratic Party spends large sums of money in support of a candidate who wins, takes office, and then implements the Party's platform, that is not corruption; that is successful advocacy of ideas in the political marketplace and representative government in a party system. To borrow a phrase from *Federal Election Comm'n* v. *NCPAC:* "The fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political messages paid for by [political groups] can hardly be called corruption, for one of the essential features of democracy is the presentation to the electorate of varying points of view." *Id.*, at 498. Cf. *Federal Election Comm'n* v. *MCFL*, 479 U. S., at 263 (suggesting that "[v]oluntary political associations do not . . . present the specter of corruption").

The structure of political parties is such that the theoretical danger of those groups actually engaging in *quid pro quos* with candidates is significantly less than the threat of individuals or other groups doing so. See Nahra, *supra*, at

97–98 (citing F. Sorauf, Party Politics in America 15–18 (5th ed. 1984)). American political parties, generally speaking, have numerous members with a wide variety of interests, Nahra, *supra,* at 98, features necessary for success in majoritarian elections. Consequently, the influence of any one person or the importance of any single issue within a political party is significantly diffused. For this reason, as the Party's *amici* argue, see Brief for Committee for Party Renewal et al. as *Amicus Curiae* 16, campaign funds donated by parties are considered to be some of "the cleanest money in politics." J. Bibby, Campaign Finance Reform, 6 Commonsense 1, 10 (Dec. 1983). And, as long as the Court continues to permit Congress to subject individuals to limits on the amount they can give to parties, and those limits are uniform as to all donors, see 2 U. S. C. § 441a(a)(1), there is little risk that an individual donor could use a party as a conduit for bribing candidates.

In any event, the Government, which bears the burden of "demonstrat[ing] that the recited harms are real, not merely conjectural," *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 664 (1994), has identified no more proof of the corrupting dangers of coordinated expenditures than it has of independent expenditures. Cf. *ante,* at 618 ("The Government does not point to record evidence or legislative findings suggesting any special corruption problem in respect to independent party expenditures"). And insofar as it appears that Congress did not actually enact § 441a(d)(3) in order to stop corruption by political parties "but rather for the constitutionally insufficient purpose of reducing what it saw as wasteful and excessive campaign spending," *ibid.* (citing *Buckley* v. *Valeo, supra,* at 57), the statute's ceilings on coordinated expenditures are as unwarranted as the caps on independent expenditures.

In sum, there is only a minimal threat of "corruption," as we have understood that term, when a political party spends to support its candidate or to oppose his competitor, whether

or not that expenditure is made in concert with the candidate. Parties and candidates have traditionally worked together to achieve their common goals, and when they engage in that work, there is no risk to the Republic. To the contrary, the danger to the Republic lies in Government suppression of such activity. Under *Buckley* and our subsequent cases, § 441a(d)(3)'s heavy burden on First Amendment rights is not justified by the threat of corruption at which it is assertedly aimed.

*     *     *

To conclude, I would find § 441a(d)(3) unconstitutional not just as applied to petitioners, but also on its face. Accordingly, I concur only in the Court's judgment.

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

In my opinion, all money spent by a political party to secure the election of its candidate for the office of United States Senator should be considered a "contribution" to his or her campaign. I therefore disagree with the conclusion reached in Part III of the principal opinion.

I am persuaded that three interests provide a constitutionally sufficient predicate for federal limits on spending by political parties. First, such limits serve the interest in avoiding both the appearance and the reality of a corrupt political process. A party shares a unique relationship with the candidate it sponsors because their political fates are inextricably linked. That interdependency creates a special danger that the party—or the persons who control the party—will abuse the influence it has over the candidate by virtue of its power to spend. The provisions at issue are appropriately aimed at reducing that threat. The fact that the party in this case had not yet chosen its nominee at the time it broadcast the challenged advertisements is immaterial to the analysis. Although the Democratic and Republican nominees

for the 1996 Presidential race will not be selected until this summer, current advertising expenditures by the two national parties are no less contributions to the campaigns of the respective frontrunners than those that will be made in the fall.

Second, these restrictions supplement other spending limitations embodied in the Federal Election Campaign Act of 1971, which are likewise designed to prevent corruption. Individuals and certain organizations are permitted to contribute up to $1,000 to a candidate. 2 U. S. C. § 441a(a)(1)(A). Since the same donors can give up to $5,000 to party committees, § 441a(a)(1)(C), if there were no limits on party spending, their contributions could be spent to benefit the candidate and thereby circumvent the $1,000 cap. We have recognized the legitimate interest in blocking similar attempts to undermine the policies of the Act. See *California Medical Assn.* v. *Federal Election Comm'n,* 453 U. S. 182, 197–199 (1981) (plurality opinion) (approving ceiling on contributions to political action committees to prevent circumvention of limitations on individual contributions to candidates); *id.,* at 203 (Blackmun, J., concurring in part and concurring in judgment); *Buckley* v. *Valeo,* 424 U. S. 1, 38 (1976) *(per curiam)* (approving limitation on total contributions by an individual in connection with an election on same rationale).

Finally, I believe the Government has an important interest in leveling the electoral playing field by constraining the cost of federal campaigns. As Justice White pointed out in his opinion in *Buckley,* "money is not always equivalent to or used for speech, even in the context of political campaigns." *Id.,* at 263 (opinion concurring in part and dissenting in part). It is quite wrong to assume that the net effect of limits on contributions and expenditures—which tend to protect equal access to the political arena, to free candidates and their staffs from the interminable burden of fundraising,

and to diminish the importance of repetitive 30-second commercials—will be adverse to the interest in informed debate protected by the First Amendment. See *id.*, at 262–266.

Congress surely has both wisdom and experience in these matters that is far superior to ours. I would therefore accord special deference to its judgment on questions related to the extent and nature of limits on campaign spending.* Accordingly, I would affirm the judgment of the Court of Appeals.

---

*One irony of the case is that both the Democratic National Party and the Republican National Party have sided with petitioners in challenging a law that Congress has the obvious power to change. See Brief for Democratic National Committee as *Amicus Curiae*; Brief for Republican National Committee as *Amicus Curiae*.