**REPUBLICAN PARTY OF MINNESOTA, Kevin Knight, and Rich Pogin, Plaintiffs,**

**v.**

**Sidney PAULY, in her capacity as Acting Chair of the Minnesota Campaign Finance and Public Disclosure Board or her successor, Defendant.**

**No. CIV. 98–1698 ADM/AJB.**

United States District Court, D. Minnesota.

Sept. 16, 1999.

Tony P. Trimble, and Matthew W. Haapoja, Trimble & Associates, Ltd., Minnetonka, Minnesota, appeared for and on behalf of the Plaintiffs.

Assistant Attorneys General Mark B. Levinger, and Peter Ackerberg, State of Minnesota Attorney General's Office, appeared for and on behalf of the Defendant.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

The above-titled matter came on for hearing before the undersigned United States District Judge on July 22, 1999, pursuant to the parties' cross-motions for summary judgment [Doc. Nos. 25, 35]. Plaintiffs Republican Party of Minnesota, Kevin Knight, and Rich Pogin filed the instant action on July 14, 1998, seeking to enjoin the State of Minnesota from enforcing a portion of the Ethics in Government Act, Minn.Stat. § 10A.01, subd. 10b. In a July 24, 1998 Order, this Court denied Plaintiffs' request for a temporary re-

straining order. After extensive discovery, both parties now move for summary judgment.

## II. BACKGROUND

### A. Parties

Plaintiff Republican Party of Minnesota ("RPM") is a state political party, as defined by Minn.Stat. § 10A.01, subd. 17. The RPM recruits and endorses candidates for state elective office and engages in fund-raising and advocacy programs in support of candidates and issues. The RPM also engages in other political activities, including voter recruitment and education and party-building. Plaintiff Kevin Knight ("the Candidate" or "Knight") was the RPM's nominee for the office of Minnesota State Treasurer in the 1998 election. Plaintiff Rich Pogin ("the Treasurer" or "Pogin") served as treasurer of the Knight for Treasurer political committee ("the Committee").

Defendant Sidney Pauly ("Pauly") is currently serving as Acting Chair of the Minnesota Campaign Finance and Public Disclosure Board ("the CFB"). Minnesota law empowers the CFB to administer and enforce Minnesota's campaign financing system.

### B. The Minnesota Ethics in Government Act

The Minnesota Ethics in Government Act ("the Act"), Minn.Stat. § 10A.01 *et seq.*, regulates campaign financing for all candidates seeking statewide office. The Act, inter alia, mandates disclosure of campaign contributions and expenditures, limits contributions to candidates, and governs the activities of political parties, corporations, and political action committees ("PACs"). *See* Minn.Stat. §§ 10A.20, 10A.27. An important component of the Act is the state's "public financing" program. Under the program, candidates for statewide office agree to a statutory limit on the amount they spend on their campaigns in exchange for a public subsidy.

*See* Minn.Stat. § 10A.322. In 1998, 91 percent of the candidates who raised and spent more than $100 agreed to limit expenditures in return for public subsidies. *See* Aff. of Gary W. Goldsmith ¶ 4.

As a general rule, the Act allows political parties to make unlimited expenditures. These expenditures are classified as either "approved" or "independent" expenditures. The Act defines the two classes of expenditures as follows:

> **Approved Expenditure.** "Approved expenditure" means an expenditure made on behalf of a candidate by an entity other than the principal campaign committee of that candidate, which expenditure is made with the authorization or expressed or implied consent of, or in cooperation or in concert with, or at the request or suggestion of that candidate, the candidate's principal campaign committee or the candidate's agent. An approved expenditure is a contribution to that candidate.

Minn.Stat. § 10A.01, subd. 10a.

> **Independent Expenditure.** "Independent expenditure" means an expenditure expressly advocating the election or defeat of a clearly identified candidate, which expenditure is made without the express or implied consent, authorization, or cooperation of, and not in concert with or at the request or suggestion of, any candidate or any candidate's principal campaign committee or agent. An independent expenditure is not a contribution to that candidate. *An expenditure by a political party or political party unit, as defined in section 10A.275, subdivision 3, in a race where the political party has a candidate on the ballot is not an independent expenditure.*

Minn.Stat. § 10A.01, subd. 10b (emphasis added). More simply put, an "approved expenditure" is made with the consent or cooperation of the candidate and is counted against that candidate's statutory contribution limits. An "independent expenditure" is made independent of the

candidate and is not considered a contribution. However, the final sentence of subdivision 10b, addressing political party expenditures made when the party has an endorsed candidate on the ballot, is an exception to this general rule and is the subject of the constitutional challenge in this lawsuit.

While the independent expenditure limitation of subdivision 10(b) does not directly limit the *amount* of a party's expenditure, it does impose a restriction on the expenditure's *timing*.[1] Implicit in this provision is a presumption that, once a party has endorsed a candidate for elective office, any expenditures made on that candidate's behalf are no longer independent. Thus, they are considered "approved expenditures" (coordinated with the candidate) and are counted against the statutory contribution limits.[2] The limitation deals only with expenditures by political parties or party units. No comparable restriction applies to independent expenditures by individuals, PACs, labor unions, or other organizations.

The Board has issued advisory opinions interpreting subdivision 10b to mean that a party "has a candidate on the ballot" when "the primary election results are certified by the state canvassing board...." Adv. Op. 299 at 5 (Aug. 5, 1998); Affidavit of Peter M. Ackerberg, Ex. A. This date occurs seven days after the state primary election. *See* Minn.Stat. § 204C.33, subd. 2. In 1998, the date fell six weeks before the general election. Thus, pursuant to subdivision 10b, the RPM was free to make unlimited independent expenditures on Knight's behalf until he was certified as the primary winner. After he was certified as the Republican candidate, however, RPM expenditures on Knight's behalf were allocated as contributions. *See* Adv. Op. 299 at 6.

In addition to counting against the candidate's contribution limits, subdivision 10b affects the candidate's spending if he has entered into the public financing agreement. Any candidate-related party expenditures made after the candidate has been certified as the party nominee also count directly against the candidate's agreed-upon spending limits. In this case, for instance, when RPM purchased a $5,000 advertisement on Knight's behalf, the expenditure counted directly against his $135,559 spending limit as the party's certified nominee. *See* Minn.Stat. § 10A.25, subd. 2(3).

### C. 1998 Republican Party Activities

A primary objective of the RPM is to support Republican candidates for statewide and legislative office. *See* Aff. of Matthew W. Haapoja, Ex. F (Cooper Dep.) at 20, 23. During the 1998 campaign season, RPM Chairman William A. Cooper and RPM Executive Director Anthony G. Sutton were responsible for the preparing, planning, and execution of the RPM's campaign expenditures. *Id.* at 24; Haapoja Aff., Ex. G (Sutton Dep.) at 38.

A permanent staff of the RPM assists candidates with "meaningful and helpful" service and "direct support." Ackerberg Aff., Ex. C (*Report from the State Chair*) at 2. The RPM's political and communications directors are charged with maintaining "close contact" with "elected officials and statewide campaigns." *Id.* at 1–2. Other RPM officials "work directly with Republican candidates on issue research," "develop campaign plans," and "manage the scheduling of candidate and party activity." *Id.* at 3. The RPM assists candidates by engaging in activities that "the candidates can't possibly afford to do ... as far as sample ballots, [and] get out the vote..." Haapoja Aff., Ex. G at 18.

---

1. Subdivision 10(b) only indirectly limits the amount of party expenditures by regulating them as limited "contributions" to the candidate.

2. Contributions are subject to limitations ranging from $5,000 to $20,000, depending on the state office sought by the candidate. *See* Minn.Stat. § 10A.27, subds. 1 and 2.

On numerous occasions during 1998, endorsed candidates for statewide office appeared at RPM fund-raising events. The record specifically identifies several appearances by Republican-endorsed gubernatorial candidate Norm Coleman at events raising money for the party during the summer and fall of 1998. *See* Haapoja Aff., Ex. F at 18, 19, 21, 22, 31, and 38. Chairman Cooper attributes Coleman's presence at RPM events to Coleman's status as the "standard bearer for the Party." *Id.* at 31. Beginning in July, 1998, the RPM also encouraged its candidates to attend biweekly "coordinating meetings" at party headquarters. *See* Ackerberg Aff., Ex. H.

During the campaign the RPM spent money on a number of television and radio advertisements supporting Republican nominees for statewide office or attacking Democratic opponents. *See* Haapoja Aff., Ex. G at 28. In addition to media advertisements, RPM also paid for various print materials in support of the campaigns of other endorsed candidates. *Id.* at 32. RPM officials testified that they did not cooperate with officials from the individual campaigns in the development of the ads. As Director Sutton explained, "We felt based upon legal advice that [cooperation] would be against the law." *Id.* at 29. In order to maintain a "firewall" between the Coleman campaign and the RPM, the RPM enlisted the services of a different national media consultant than the one hired by the gubernatorial campaign. *Id.* at 37.

The RPM also provided its endorsed candidates with financial support in the form of cash contributions or "in-kind" donations. As Sutton explained, "we would generally want to max out to our candidates, our statewide candidates. Some of them we did totally in cash; some of them were combinations of cash and in-kind." *Id.* at 47. The RPM made and reported its contributions pursuant to Minnesota campaign finance regulations. *Id.*

One of the candidates who received funding from the RPM was Plaintiff Knight, the endorsed candidate for State Treasurer. The RPM gave Knight's campaign $5,000, the maximum contribution permitted to his campaign from a political party unit. *See* Minn.Stat. § 10A.27, subd. 2. The RPM was unable to provide Knight with any additional support after his endorsement due to the limitations of subdivision 10(b). As Sutton testified, the RPM "contemplated and desired to make independent expenditures related to Mr. Knight's candidacy," but was not able to do so for fear of "subjecting the RPM, [Pogin] and/or [Knight] to liability for violating the RPM's contribution limits to the Candidate." Sutton Aff. ¶ 4. The RPM refrained from making any further expenditures on Knight's behalf. *Id.* ¶ 5. Subsequent to the primary election, the RPM refrained from making independent expenditures on behalf of any of its endorsed candidates due to a similar fear of legal liability. *See* Haapoja Aff., Ex. G at 56; Sutton Aff. ¶ 6.

Plaintiffs filed the instant suit claiming that subdivision 10(b) has a chilling effect on their protected First Amendment right to engage in political speech in the form of independent expenditures.

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of stating grounds for its motion and demonstrating the lack of issues of genuine material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Having done so, the opposing party may not simply rest on the allegations

or denials of its pleadings, but must come forward with sufficient evidence to demonstrate a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When evaluating the parties' submissions on a motion for summary judgment, the evidence of the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Consequently, the facts must be stated and analyzed in the light most favorable to the plaintiff. A dispute concerning a material fact is "genuine" and sufficient to overcome a summary judgment motion "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

Ordinarily, the Court's task on a motion for summary judgment is not to weigh facts or evaluate the credibility of affidavits and other evidence. The nonmovant cannot, however, avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact that is alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. *See Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992).

## B. First Amendment Analysis

### 1. Standard for Regulation of Political Speech

■ Plaintiffs challenge subdivision 10(b) as an unconstitutional infringement of their First Amendment rights to engage in political speech and association. "Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation." *Federal Election Comm'n v. Massachusetts Citizens for Life*, 479 U.S. 238, 265, 107 S.Ct. 616, 93 L.Ed.2d

539 (1986). Government attempts to limit campaign spending, like Minnesota's subdivision 10(b), are "subject to the closest scrutiny." *Carver v. Nixon*, 72 F.3d 633, 636 (8th Cir.1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). Under this standard, a significant interference with Plaintiffs' speech rights may be sustained only when the state demonstrates a compelling state interest and the regulation is closely drawn to avoid unnecessary abridgement of First Amendment freedoms. *See Carver*, 72 F.3d at 636.

In *Buckley*, the initial foray into the campaign finance area, the Court recognized that "the prevent[ion][of] corruption or the appearance of corruption" are "the only legitimate and compelling government interests thus far identified for restricting campaign finances." *Buckley*, 424 U.S. at 47, 96 S.Ct. 612. In a litany of more recent decisions, the Court has continued to adhere to this principle. *See Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 296–97, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (*"Buckley* identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a candidate."); *see also Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 659–60, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990); *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 496–97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 820, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). The Eighth Circuit Court of Appeals has followed the Supreme Court's direction and strictly applied this principle. *See Russell v. Burris*, 146 F.3d 563 (8th Cir. 1998); *Shrink Mo. Gov't PAC v. Adams*, 161 F.3d 519 (8th Cir.1998), *cert granted*, —— U.S. ——, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999).

The *Buckley* Court defined corruption first in terms of the danger of a *quid pro*

*quo* between the candidate and the donor contributing directly to that candidate's campaign. As the Court explained: "To the extent that large contributions are given to secure political *quid pro quo's* from current and potential office holders, the integrity of our system of representative democracy is undermined." *Buckley,* 424 U.S. at 26–27, 96 S.Ct. 612. The Court did not limit its focus to actual *quid pro quo* arrangements, but further stated:

> Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions... Congress could legitimately conclude that the avoidance of the appearance of improper influence is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent.

*Id.* The Court considered the government interest in preventing corruption or its appearance sufficiently compelling to uphold the contribution limits in the Federal Election Campaign Act ("FECA").

While the Court has upheld various limitations on direct contributions to candidates, it has consistently struck down governmental restrictions on expenditures—reasoning that independent expenditures by individuals or entities provide less threat of corruption than that stemming from a *quid pro quo* arrangement with the candidate. *See Buckley,* 424 U.S. at 59, 96 S.Ct. 612 (striking down restrictions on expenditures of personal funds by individuals and candidates for federal office); *Federal Election Comm'n v. National Conservative Political Action Comm.,* 470 U.S. 480, 497–502, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (invalidating limitations on political spending by PACs); *Massachusetts Citizens for Life,* 479 U.S. at 268, 107 S.Ct. 616 (striking restrictions on independent spending by incorporated political association).

The regulated political speech at issue in this matter is presented in the factual context of independent expenditures by political parties.

### 2. *The Colorado Republican Case*

In a recent campaign finance case, *Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n,* 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996), the Court considered the extent to which the First Amendment allows the government to regulate political party expenditures—a nearly identical issue to the one raised here. While the *Colorado Republican* Court struck down the specific provision at issue, it failed to reach a consensus on the broader question of regulation of political party expenditures. The splintered nature of the Court's four separate opinions makes an authoritative majority difficult to ascertain.

In his plurality opinion, Justice Breyer, joined by Justices O'Connor and Souter, decided the case by circumventing the First Amendment issue. The Justices found that in the fact pattern presented the political party's expenditures were truly independent of its candidates and *Buckley* barred their limitation. Left undecided was the question of whether the First Amendment would bar limiting party expenditures that were *coordinated* with the candidate. In their dissenting opinion, Justices Stevens and Ginsberg held that the Government *could* limit party expenditures which are presumably not independent of the candidates. Justices Kennedy, Scalia, and Thomas, and Chief Justice Rehnquist, came to the opposite conclusion, holding that the First Amendment bars the regulation of even coordinated expenditures.

In a portion of his opinion directly applicable to this case, Justice Breyer explained the *stare decisis* justification for the striking down of limitations on political party independent expenditures:

> Given these established principles [established in *Buckley* and its progeny],

we do not see how a provision that limits a political party's independent expenditures can escape their controlling effect. A political party's independent expression not only reflects its members' views about the philosophical and governmental matters that bind them together, it also seeks to convince others to join those members in a practical democratic task, the task of creating a government that voters can instruct and hold responsible for subsequent success or failure. The independent expression of a political party's views is "core" First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees.

We are not aware of any special dangers of corruption associated with political parties that tip the constitutional balance in a different direction. When this Court considered, and held unconstitutional, limits that FECA had set on certain independent expenditures by political action committees, it reiterated Buckley's observation that "the absence of prearrangement and coordination" does not eliminate, but it does help to "alleviate," any "danger" that a candidate will understand the expenditure as an effort to obtain a *quid pro quo*. The same is true of independent party expenditures.

*Id.* at 615–16, 116 S.Ct. 2309 (*citing Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) and *NCPAC*, 470 U.S. at 498, 105 S.Ct. 1459).

The question of "actual coordination," in light of the *Colorado Republican* decision, thus becomes the lynchpin of this case. The Defendant's position is strengthened by the plurality opinion's failure to rule definitively on the underlying constitutional question. This opinion left open the possibility that independent expenditures by political parties, when actually coordinated with the candidate, are subject to some form of permissible regulation.

The entire Court recognized that parties and candidates usually work closely with one another. In dissent, Justice Stevens explained, the "public fates" of the party and candidate are "inextricably linked." *Id.* at 648–49, 116 S.Ct. 2309 (Stevens, J., dissenting). Even Justice Kennedy admitted that "it would be impractical and imprudent, to say the least, for a party to support its own candidates without some form of 'cooperation' or 'consultation.'" *Id.* at 629, 116 S.Ct. 2309 (Kennedy, J., concurring in the judgment and dissenting in part).

While all of the justices acknowledged that parties and candidates have similar interests, seven of them agreed on the following proposition: a reviewing court may not merely "presume" coordination between the candidate and the political party. *Id.* at 621, 116 S.Ct. 2309. Specifically, Justice Breyer criticized the FEC's characterization of all party expenditures as "coordinated" with the party, explaining: "An agency's simply calling an independent expenditure a 'coordinated expenditure' cannot (for constitutional purposes) make it one." *Id.* at 621, 116 S.Ct. 2309. Justice Breyer further stated "the Government and supporting amici argue that the expenditure is 'coordinated' because a party and its candidate are identical, i.e., the party, in a sense, 'is' its' candidates. We cannot assume, however, that this is so." *Id.* at 622, 116 S.Ct. 2309. The plurality struck down the provisions at issue because of a lack of evidence on the record supporting a finding of actual coordination between the party and the candidate—evidence necessary to support a compelling interest for the expenditure restriction. *Id.* at 620–23, 116 S.Ct. 2309 (explaining that the Government passed the expenditure regulation "without any internal or external evidence that the FEC means it to embody an empirical judgment (say, that parties, in fact hardly spend any money independently) or to represent the outcome of an empirical investigation").

3. *The Government's Evidentiary Burden*

In recent decisions, the Eighth Circuit has adopted Justice Breyer's rationale and required the government to produce actual empirical evidence to support the existence of a compelling state interest for a campaign finance regulation. In *Shrink,* 161 F.3d at 521, the court explained: "[w]e [are] not satisfied with the mere contention that the states have an interest (an indisputably compelling interest) in maintaining the integrity of their elections. We require some demonstrable evidence that there were genuine problems that resulted from [the regulated conduct]." *Id.* The *Shrink* court noted specifically that the only evidence of corruption or potential corruption from the large contributions targeted by a Missouri statute was an affidavit from a state senator who sponsored the regulation. *Id.* at 522. The court determined that the government failed to demonstrate the existence of a material fact regarding its alleged interest in restricting the contributions.

In *Russell v. Burris,* 146 F.3d 563, 567 (8th Cir.1998), the court also emphasized the government's evidentiary burden. In that case, the Eighth Circuit ruled that an Arkansas limitation on state contribution limits failed to pass constitutional muster. Fatal to the provision was the government's failure to "provide any credible evidence to the trial court of actual undue influence or corruption" stemming from the targeted conduct. *Id.* at 569. Just last month, in *Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963 (8th Cir. 1999), the Eighth Circuit rejected an Iowa reporting requirement for independent expenditures due to a lack of supporting evidence. The court noted the government's lack of "convincing evidence or findings that the statute is necessary to combat a substantial danger of corruption of the electoral system." *Id.* at 968. *See also Carver,* 72 F.3d at 638; *Day v. Holahan,* 34 F.3d 1356, 1365 (8th Cir.1994). This long line of Eighth Circuit precedent confirms that the Defendant faces a heavy evidentiary burden in demonstrating a compelling interest in regulating campaign spending.

a. Party and Candidate Coordination— Actual Corruption

██ The record in this case is replete with examples of cooperation between the RPM and its endorsed candidates. The RPM often provided administrative and strategic support to the candidates. The party coordinated candidate appearances and voter registration drives, and helped to recruit volunteer assistance. RPM officials conducted "issue research," "develop[ed] campaign plans," and provided candidates with donor lists from which to solicit campaign contributions. *See* Ackerberg Aff., Ex. D. However, the record in this case provides no support for an inference of actual coordination in conducting independent party expenditures.

The only evidence in the record which approaches the required evidence of coordination is candidate participation in party fund-raising events. By appearing at a RPM fund-raising event, one could argue that a candidate is, at least constructively, entering into a situation with *quid pro quo* potential. The mere fact that the candidate solicits a check made out to "The Republican Party of Minnesota" does not eliminate the role he played in soliciting the funds—funds which may in turn be spent by the party on behalf of his campaign. The legal flaw with this argument, however, is the fact that the candidates' undisputed participation in the *raising* of party funds does not directly relate to the specific conduct being regulated—in this case, political party *spending*. *See Massachusetts Citizens for Life,* 479 U.S. at 265, 107 S.Ct. 616.

If subdivision 10(b) regulated participation by candidates in party fund-raising, this evidence of candidate participation in the events would be relevant to and perhaps dispositive of the inquiry. The provision at issue, however, addresses only the manner in which the parties spend the

money. On the record before this Court there is simply no evidence even suggesting candidate participation in the allocation, budgeting, or distribution of the funds by the party. To the contrary, the evidence at record here evinces a calculated attempt by the RPM and its candidates to maintain a "wall" when it came to spending decisions. *See* Haapoja Aff., Ex. G at 28, 29. As Justice Breyer held in *Colorado Republican*, the government must produce evidence of actual coordination. 518 U.S. at 621, 116 S.Ct. 2309. "Simply calling an independent expenditure a 'coordinated expenditure' cannot (for constitutional purposes) make it one." *Id.*

■ The Defendant attributes the impetus behind subdivision 10(b) to a "legislative determination that a party and its nominee work together." Def. Mem. Supp. Summ. J. at 6. The record, however, is void of any committee findings, legislative debate transcripts, legislative findings, or other empirical evidence to support such a legislative determination. While an adequately supported legislative determination of corruption may, in fact, support a campaign finance restriction, *see Shrink*, 161 F.3d at 522, the record in this case falls short of demonstrating the empirical need for such an infringement on First Amendment rights.

b. Subdivision 10(b)'s Time Component

■ The record also fails to support a compelling need for subdivision 10(b) from a timeliness standpoint. The Defendant argues that the provision is a "valid time and manner" restriction which is "justified without reference to the content of the regulated speech" and "leaves open ample alternative channels for communication of the information." Pl. Mem. Supp. Summ. J. at 9 (*citing Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). By limiting party expenditures during the final period of the campaign season, the Defendant argues that the provision is a limited restriction.

The Defendant's evidence again fails to support the need for a restriction during this particular time frame. The testimony of record regarding candidate appearances at fund-raising events in 1998 indicates that only a small number of the appearances took place during the post-endorsement period. In fact, the great majority of candidate Coleman's appearances took place from March through August—well before the period of time the Government asserts the party and candidate "coordination" poses the greatest danger. *See* Haapoja Aff., Ex. F at 18, 19, 21, 22, 31 and 38. There is no evidence at all of coordination between the Knight campaign and the RPM during the post-endorsement period.

c. The Appearance of Corruption

■ The Defendant also attempts to defend subdivision 10(b) as necessary to prevent the "appearance of corruption." The Supreme Court in *Buckley* acknowledged the challenge and practical difficulties of producing evidence of actual corruption. Evidence of such an amorphous concept is often difficult to identify and easily concealed by parties and candidates. *See Buckley*, 424 U.S. at 33, 96 S.Ct. 612. The Court recognized the equal danger posed by the appearance of corruption and accepted the preservation of the public's faith in the electoral system as a compelling governmental interest. *Id.* The same evidentiary burdens on the Government apply.

The singular thread of evidence offered to support public perception of the effects of unlimited party expenditures is an independent public opinion poll of Minnesotans prepared in conjunction with this case ("the campaign survey"). *See* Ackerberg Aff., Ex. M (St. Cloud State University, Social Science Research Institute, *Perceptions of Campaign Contribution Limits and Political Corruption of Minnesota Public Officials: An Analysis of Survey Results*). As Plaintiffs argue, the results of this survey are of dubious substantive value.

None of the survey questions elicited statements about public perceptions of real corruption under the current system. Nor did any of the questions specifically query the respondents regarding independent expenditures by political parties—the "evil" sought to be cured by subdivision 10(b). Survey respondents agreed, admittedly, but not surprisingly, at an overwhelming rate, that "campaign contribution limits on individuals are important to preventing corruption of public officials" and "candidates and parties in Minnesota get around these contribution limits on individuals by soliciting contributions for the political party of the candidates." *Id.* at 3, 96 S.Ct. 612.

From a methodological standpoint, the survey questions were phrased in a leading fashion so as to elicit the desired responses from the respondents—requiring participants to merely "agree" or "disagree" with conclusory statements about campaign financing. Standing alone, the campaign survey is an insufficient indicia of the true public perceptions of political party expenditures. To support a restraint on the RPM's rights to free speech and association, the Defendant must provide substantially more objective evidence than a self-serving survey of leading questions administered to a small sample of Minnesota voters. *See Shrink,* 161 F.3d at 522 (*citing Russell,* 146 F.3d at 569) ("[t]here is no way for us to tell whether this ... perception of corruption is the 'public perception,' whether it is objectively 'reasonable,' and whether it derived from the magnitude of contributions that historically have been made to candidates running for public office.").

4. *Preservation of the Public Financing System*

■ As an alternative to a compelling interest in preventing corruption, the Defendant defends subdivision 10(b) as necessary to "preserv[e] the integrity of Minnesota's campaign finance reforms." Def. Mem. Opp. Summ. J. at 4. The Defendant

argues that, "in the absence of subdivision 10(b), Minnesota's campaign subsidy program will be a nullity because the candidate expenditure limits will be unenforceable." Def. Mem. Supp. Summ. J. at 11. Under subdivision 10(b), the Defendant argues, any expenditures made by political parties on behalf of Knight or other candidates should be counted against those limits. *Id.*

Under direct constitutional challenge, Minnesota's public subsidy program has been upheld by the Eighth Circuit. In *Rosenstiel v. Rodriguez,* 101 F.3d 1544, 1550 (8th Cir.1996), the inducements for participation in the subsidy program were found not to compel limitations on spending and thus did not burden the First Amendment rights of nonparticipating candidates. The court also held that, even if the restrictions were to have infringed free speech, the provisions are narrowly tailored to meet a compelling state interest in limiting the importance of money (and thus corruption) in Minnesota electoral politics. *Id.* at 1555. The Defendant attempts to expand the Eighth Circuit's approval of the subsidy system as a tacit ruling that its preservation qualifies as a compelling state interest. The Court has found no case law to support such a proposition.

The *Buckley* Court unequivocally held that prevention of corruption and the appearance thereof are "the only legitimate and compelling government interests thus far identified for restricting campaign finances." 424 U.S. at 47, 96 S.Ct. 612. The Defendant contends that the legitimate operation of the subsidy program itself is an additional compelling reason to justify a regulation of the parties' political speech. To argue that the preservation of a regulation, the very constitutionality of which hinges on its own underlying necessity as satisfying the constitutionally required compelling interest is circular logic. The Defendant cannot bootstrap the constitutionally infirm restriction on party expenditures to the constitutionally valid public subsidy scheme. The two provi-

sions limit different types of political speech (independent expenditures vs. candidate contributions) by different actors (political parties vs. non-participating candidates) and must each be supported by an independent compelling state interest.

Even if the preservation of the subsidy system represented a compelling interest, the regulation would nonetheless fail the strict scrutiny test. The Defendant's contention hinges on the assumption that candidates and parties intend to use party contributions to circumvent the spending limitations of the public financing program. In the absence of a verifiable level of coordination, there is no way to discern the impact of an independent expenditure on the candidate's behalf from one made by a PAC, a labor union, or a wealthy individual. The only difference is the Defendant's unsupported presumption of coordination. Absent empirical evidence that no party expenditures are truly independent, the compelling need for subdivision 10(b) to preserve the campaign subsidy system is insufficient.[3]

5. *Summary*

■ As a policy matter, this Court feels the need for meaningful campaign finance reform has been well established. With each successive campaign year, the candidates' and parties' insatiable drive for money eats away at the fiber of American democracy, arguably placing the interests of wealthy contributors ahead of those of the average voter. Legislation aimed at limiting the importance of money in political campaigns is an important challenge for policymakers. Legislating in this sphere, however, is extremely difficult because any restrictions on the flow of politically motivated spending collide directly with the cherished, yet fragile, freedoms guaranteed by the First Amendment. The Supreme Court in *Buckley* and *Colorado*

*Republican* has imposed upon the Government a significant burden to justify, with solid evidence, the need for particular restrictions on political speech. While attempting to engage in a noble pursuit of campaign reform through subdivision 10(b), the Defendant here simply has not met its constitutionally required burden. With a more fully developed record supporting corruption or the appearance thereof, the outcome may have well been different. However, Supreme Court and Eighth Circuit precedent requires that RPM's First Amendment rights prevail. For the reasons set forth above, Minn. Stat. § 10A.01, subd. 10b, to the extent it refuses to allow for "eleventh hour" independent expenditures by political parties, is unconstitutional as a matter of law.[4]

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Doc. No. 35] is **GRANTED**; and,

2. Defendant's Motion for Summary Judgment [Doc. No. 25] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

**3.** Since the Defendant failed to adduce evidence of a compelling interest, whether subdivision 10(b) is "narrowly tailored" will not be addressed here.

**4.** In light of subdivision 10(b)'s First Amendment problems, Plaintiffs' Equal Protection challenge will also not be addressed.