DISCIPLINARY COUNSEL *v.* SPICER.

[Cite as *Disciplinary Counsel v. Spicer,*
106 Ohio St.3d 247, 2005-Ohio-4788.]

(No. 2004–1414—Submitted January 12, 2005—Decided September 28, 2005.)

O'DONNELL, J.

{¶ 1} This matter comes before our court for review of a recommendation of the Board of Commissioners on Grievances and Discipline of the Supreme Court—with which the parties generally agree—that Judge Willard Spicer of the Summit County Probate Court be publicly reprimanded for conduct arising from negative television advertising sponsored by his campaign committee against his opponent in his 2002 campaign for reelection. Importantly, the board also accepted the hearing panel's recommendation that a second count—relating to the alleged failure by Judge Spicer's campaign committee to report a $97,466.13 expenditure by the Summit County Republican Party as an in-kind contribution—be dismissed in its entirety because the panel determined that the expense was not made with the consent of, in coordination, cooperation, or consultation with, or at the request or suggestion of a judicial candidate, the campaign committee, or the agent of the judicial candidate.

{¶ 2} Disciplinary Counsel seeks clarification of Canon 7 of the Code of Judicial Conduct as to what constitutes an in-kind contribution and challenges the board's recommendation to dismiss this charge. Hence, the central issue for our consideration is whether the Summit County Republican Party advertising expenditure constituted an in-kind contribution that Judge Spicer's campaign committee should have reported.

{¶ 3} The record before us is not generally disputed, as the parties have entered into agreed stipulations in this matter. The facts reveal that Judge Spicer's campaign committee aired three television advertisements before the election: the first focused on the judge and his positive attributes, the second compared his experience with that of his opponent, and the third unfairly attacked his opponent during the final four days before the election.

{¶ 4} Judge Spicer's campaign utilized Sagamore Communications, L.L.C., a company formed in 2000 and co-owned by Joseph Masich, the treasurer, and Alex Arshinkoff, the chairman, of the Summit County Republican Party to produce and air campaign ads. In addition to serving as party treasurer and co-owner of Sagamore Communications, however, Masich also served as administrator of the Summit County Probate Court and helped organize Judge Spicer's campaign.

{¶ 5} While the commercials were being produced, Arshinkoff informed Judge Spicer that the Summit County Republican Party intended to broadcast them using the party disclaimer as part of its candidate-slate advertising. Judge Spicer was aware that his committee had previously received $38,000 from the Summit County Republican Party, and he therefore asked Arshinkoff to seek advice from the Supreme Court of Ohio as to whether the party could conduct such advertising.[1] As a result, Terry Casey, a political consultant hired by the

---

1. {¶ a} At that time, Canon 7(C)(5)(a) of the Code of Judicial Conduct provided:

party and Sagamore Communications, called a member of the Supreme Court administrative staff regarding the intended advertising. According to the stipulations, Casey was told that "there were no rules or specifications as to limit what political parties could do and communicate under slate advertisement, assuming the slate advertising was properly funded, directed, acknowledged, and controlled by the party." Masich and Arshinkoff both assured Judge Spicer that the proposed advertising would not violate Supreme Court Rules, and in accordance with their assurances, neither involved Judge Spicer in the advertising or identified it to him as an in-kind contribution.

{¶ 6} The Summit County Republican Party spent $97,466.13 televising the Judge Spicer commercials as part of its slate advertising. On campaign disclosure statements, however, Judge Spicer's committee reported only the party's $38,000 contribution.

{¶ 7} In a disciplinary complaint filed against Judge Spicer in 2003, Disciplinary Counsel alleged that the $97,466.13 advertising expense incurred by the party constituted an in-kind contribution to Judge Spicer's campaign committee, which it should have reported. See Canon 7(C)(8) of the Code of Judicial Conduct ("The campaign committee of a judicial candidate who is elected to the Supreme Court, court of common pleas, municipal court, or county court shall file a copy of all contribution and expenditure statements specified in division (A) of section 3517.10 of the Revised Code with the clerk of the court"). Disciplinary Counsel further alleged that by accepting the in-kind contribution from the party, Judge Spicer exceeded the limit for a campaign contribution by a political party. See former Canon 7(C)(5)(a)(iii)(E), 90 Ohio St.3d CXIX–CXX.

{¶ 8} The matter is now before this court on Disciplinary Counsel's objections to the report by the Board of Commissioners on Grievances and Discipline, in which Disciplinary Counsel asserts that the commercials paid for by the Summit County Republican Party constituted an in-kind contribution to Judge Spicer's

---

{¶ b} "Except as otherwise provided in division (C)(5)(b) of this canon, the campaign committee of a judicial candidate shall not directly or indirectly solicit or receive in the fund raising period allowed by division (C)(4) of this canon a campaign contribution aggregating more than the following:

{¶ c} "* * *

{¶ d} "(iii) From a political party:

{¶ e} "* * *

{¶ f} "(E) Thirty-eight thousand four hundred dollars in the case of a judicial candidate for a court of common pleas, municipal court, or county court that serves a territorial jurisdiction with a population of more than two hundred fifty thousand but not more than seven hundred fifty thousand." 90 Ohio St.3d CXIX–CXX.

{¶ g} " 'Contribution' has the same meaning as in section 3517.01 of the Revised Code and includes an in-kind contribution." Canon 7(A)(3) of the Code of Judicial Conduct.

campaign. Disciplinary Counsel seeks guidance in determining when a party expenditure becomes an in-kind contribution to a candidate's campaign.

{¶ 9} We begin our review by examining Canon 7(A)(4) of the Code of Judicial Conduct, which defines an in-kind contribution as follows:

{¶ 10} "[A]nything of value, as defined in section 1.03 of the Revised Code, other than money or uncompensated volunteer services, that is used to influence the results of an election or is transferred to or used in support of or in opposition to a judicial candidate and that is made with the consent of, in coordination, cooperation, or consultation with, or at the request or suggestion of a judicial candidate, the campaign committee or agent of the judicial candidate, or a political party and that is paid for by any person other than the benefited judicial candidate or campaign committee for that judicial candidate."

{¶ 11} Here, the parties have stipulated to all but one part of that definition: they agree that the advertisements at issue constitute a thing of value other than money or uncompensated volunteer services, that they were used to influence the results of an election, and that they had been paid for by someone other than the benefited judicial candidate or his campaign committee. However, the parties disagree as to whether the advertising was "made with the consent of, in coordination, cooperation, or consultation with, or at the request or suggestion of" Judge Spicer, his agent, or his campaign committee.[2]

{¶ 12} Our precise inquiry here, then, concerns the meaning of the phrase "made with the consent of, in coordination, cooperation, or consultation with, or at the request or suggestion of a judicial candidate, [or] the campaign committee or agent of the judicial candidate." Canon 7(A)(4). Canon 7 does not define these terms individually or collectively.

{¶ 13} When applying similar language, federal courts have generally performed a case-by-case analysis. For example, the United States Supreme Court, in *Colorado Republican Fed. Campaign Commt. v. Fed. Election Comm.* (1996), 518 U.S. 604, 614, 116 S.Ct. 2309, 135 L.Ed.2d 795, determined that the Colorado Republican Campaign Committee's purchase of radio time for advertisements attacking the likely Democratic senatorial candidate did not constitute coordinated expenditures—that is, payments made in cooperation, consultation, or concert, with, or at the request or suggestions of a candidate, his authorized political committees, or their agents—where the party had not yet selected its nominee at the time of the expenditure, the party's chairman had arranged for the development of the script on his own initiative and had alone approved it, "the only other

---

2. Disciplinary Counsel has not argued that the advertising was made with the "consent of, in coordination, cooperation, or consultation with, or at the request or suggestion of * * * a political party." Canon 7(A)(4).

politically relevant individuals who might have read it were the Party's executive director and political director," and "all relevant discussions took place at meetings attended only by Party staff."

{¶ 14} In *Democratic Senatorial Campaign Commt. v. Fed. Election Comm.* (D.D.C.1990), 745 F.Supp. 742, 745, a court determined that the use of common consultants by a candidate's campaign committee and a political action committee ("PAC") did not, alone, render certain PAC expenditures to have been made in " 'cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents.' " Id., quoting Section 441a(a)(7)(B)(i), Title 2, U.S.Code. The court reasoned, "There was no evidence of meetings, discussions or communications (direct or indirect) between [a] PAC and the consultants; nor was there evidence that the [other] PAC information and strategies could have helped the Mack campaign. The affidavits submitted to the [Federal Election] Commission suggest that the * * * PAC built a 'Chinese Wall' between itself and the two [candidate] consultants." Id. at 746.

{¶ 15} One federal court, however, has developed a standard to determine whether an expenditure is coordinated rather than independent. In *Fed. Election Comm. v. Christian Coalition* (D.D.C.1999), 52 F.Supp.2d 45, 92, the court stated:

{¶ 16} "In the absence of a request or suggestion from the campaign, an expressive expenditure becomes 'coordinated;' where the candidate or her agents can exercise control over, or where there has been substantial discussion or negotiation between the campaign and the spender over, a communication's: (1) contents; (2) timing; (3) location, mode, or intended audience (e.g., choice between newspaper or radio advertisement); or (4) 'volume' (e.g., number of copies of printed materials or frequency of media spots). Substantial discussion or negotiation is such that the candidate and spender emerge as partners or joint venturers in the expressive expenditure, but the candidate and spender need not be equal partners."

{¶ 17} We note that in 2000, the Federal Election Commission promulgated regulations, now rescinded, defining coordinated expenditures in a manner similar to the definition in *Christian Coalition,* supra. See former Section 100.23, Title 11, C.F.R., rescinded Jan. 3, 2003, 68 F.R. 421. These regulations defined "coordinated expenditures" to include expenditures made "[a]t the request or suggestion of" the candidate, communications over which a candidate "exercised control or decision-making authority over the content, timing, location, mode, intended audience, volume of distribution, or frequency of placement of that communication," and communications made "[a]fter substantial discussion * * *

between * * * the person paying for the communication, and the candidate, * * * the result of which is collaboration or agreement." [3]

{¶ 18} These standards notwithstanding, Canon 7 explicitly requires an in-kind contribution to be made with the consent, coordination, cooperation, or consultation of the judicial candidate or his or her agent, or at the request or suggestion of the judicial candidate or agent of that candidate; there can be no such expenditure absent a meeting of the minds, including informal or de facto arrangements, with respect to the intended advertising. An agreement is an essential component of such an expenditure.

{¶ 19} Thus, in accordance with Canon 7 of the Code of Judicial Conduct, an expenditure "made with the consent of, in coordination, cooperation, or consultation with, or at the request or suggestion of a judicial candidate, [or] the campaign committee or agent of the judicial candidate" refers to one made with more than mere knowledge or passive participation on the part of the candidate and occurs when the candidate engages in substantial discussion or negotiation with the political party regarding the contents, timing, type, or frequency of the communication or when the candidate has the ability to direct or control the political party's expenditure in a meaningful way, such that the candidate and the political party engage in a joint venture. Canon 7(A)(4). A determination as to whether a particular expenditure constitutes an in-kind contribution must be made on a case-by-case basis after a consideration of the totality of the circumstances.

{¶ 20} Disciplinary Counsel agrees that passive participation by a candidate, such as furnishing a press packet or a photograph to a political party upon request, even if later used by the party in its political advertising on behalf of a slate of candidates, would not constitute an in-kind contribution. Disciplinary Counsel rather asserts that these kinds of activities become in-kind contributions when the candidate or his campaign *knows* of the party's intended use of the materials at the time of furnishing them. But this standard—knowledge on the part of a candidate—is not practical, because every candidate could know of a

---

3. {¶ a} We recognize, however, that the Bipartisan Campaign Reform Act of 2002, commonly known as the McCain–Feingold legislation, directed the Federal Election Commission to rescind the aforementioned regulations and to promulgate new ones that "shall not require agreement or formal corroboration to establish coordination." See *McConnell v. Fed. Election Comm.* (2003), 540 U.S. 93, 219–220, 124 S.Ct. 619, 157 L.Ed.2d 491, where the court cited the Congressional directive to the Federal Election Commission.

{¶ b} In *Shays v. Fed. Election Comm.* (D.D.C.2004), 337 F.Supp.2d 28, 64, citing 148 Cong.Rec. S2145 (Daily Ed. Mar. 20, 2002), the court observed that Senator Feingold criticized the former regulations for setting "too high a bar" for finding coordination and quoted Senator McCain's statement that "[i]nformal understandings and de facto arrangements can result in actual coordination as effectively as explicit agreement or formal collaboration." Id.

party's intentions when furnishing campaign material. Any candidate would hope for widespread distribution and major media exposure of his or her campaign material. Furthermore, there is no authority in the Judicial Canons for using a candidate's mere knowledge as the test for what constitutes an in-kind contribution. An in-kind contribution requires a candidate's interaction, direction, and control in the decision-making process—beyond mere knowledge and beyond mere passive participation—such as posing for a photograph or submitting biographical materials to a political party for slate-advertising purposes.

{¶ 21} When a candidate requests, suggests, directs, or exercises some degree of control over the political party's expenditure or engages in substantial discussion or negotiation with the political party regarding the content, timing, type, or frequency of the advertising, the expenditure becomes an in-kind contribution to the candidate's campaign committee. Judge Spicer, however, did not engage in such practices in this campaign.

{¶ 22} Here, Judge Spicer filmed his own campaign ads and learned then that the party might use the same ads for its own commercials on behalf of a slate of candidates. Although he participated in the decision to create an ad focusing on his opponent, he had no involvement in the party's decision to air that ad under its disclaimer.

{¶ 23} Importantly, here, at the insistence of Judge Spicer, the party contacted the Supreme Court of Ohio regarding the advertising. Acting on the information obtained, the party never included Judge Spicer in its decision-making, nor did it disclose information to him about cost or frequency of the ads or otherwise involve him in its decisions. The party also maintained exclusive control over its advertising, and it never reported its activity as an in-kind contribution to Judge Spicer. Thus, on this record, Judge Spicer's activities do not rise to the level of active involvement or interaction in the consultation, cooperation, or coordination needed to render the party's expenditure an in-kind contribution, nor do they show that the party received his consent or undertook the advertising at his suggestion, request, or direction.

{¶ 24} Disciplinary Counsel further urges that the involvement of Joseph Masich in both campaigns—Judge Spicer's campaign and the Summit County Republican Party's campaign—should render the expenditure by the party an in-kind contribution. The stipulations recognize the role that Masich played as a de facto organizer of Judge Spicer's campaign, but he did not act solely as a campaign operative in producing and arranging for the broadcast of the party's advertisements. Rather, Masich, as treasurer of the Summit County Republican Party, signed the check from the party to Sagamore Communications, and as co-owner of that company, he had a financial interest in that advertising. In

addition, he served his own interest as court administrator in seeing Judge Spicer reelected.

{¶ 25} Canon 7 seeks to avoid the intermingling of such interests. When the same person acts as a campaign organizer for the candidate and, also, as an officer of the political party, there is a danger that the person's activities could create the level of coordination between the party and the candidate that would render the party's advertising expenditure an in-kind contribution to the candidate. Under those circumstances, the expenditure would be subject to the campaign-contribution limits and reporting requirements imposed on judicial candidates by Canon 7. Thus, it is a poor campaign choice to use a campaign person with such conflicted interests, and we strongly disapprove of that practice. Once a candidate learns of a conflict of interest with respect to the roles of a campaign operative, the candidate should eliminate the conflict or discharge the individual to avoid potential disciplinary action. Judicial candidates are admonished to avoid such intermingling of interests in election campaigns.

{¶ 26} As another basis for imposing discipline, Disciplinary Counsel has asked this court to apply the definition of an "in-kind contribution" in R.C. 3517.01(B)(16), which pertains to nonjudicial political candidates and defines that term for that provision. We recognize that this statute would render the activity undertaken by the Summit County Republican Party an in-kind contribution to Judge Spicer's campaign. It reads:

{¶ 27} "The financing of the * * * republication, in whole or in part, of any broadcast * * * prepared by the candidate, the candidate's campaign committee, or their authorized agents is an in-kind contribution to the candidate and an expenditure by the candidate." Id.

{¶ 28} This language, however, is not yet part of Canon 7; hence, we are unwilling to use it as a basis to discipline Judge Spicer because fundamental tenets of the Due Process Clauses of the United States and Ohio Constitutions include notice and the opportunity to be heard. See *State v. Hayden*, 96 Ohio St.3d 211, 2002-Ohio-4169, 773 N.E.2d 502, at ¶ 6. Canon 7—not R.C. 3517.01(B)(16)—regulates in-kind contributions to judicial candidates' campaigns. Throughout his campaign, Judge Spicer had no notice that the definition of an in-kind contribution contained in R.C. 3517.01(B)(16) would be applied to him. Applying that statute under these circumstances could cause candidates to be disciplined for engaging in conduct that has not been proscribed, potentially resulting in due process violations. Accordingly, we decline to read the statutory definition of "in-kind contribution" into Canon 7.

{¶ 29} As the Board of Commissioners on Grievances and Discipline did not find a Canon 7 violation, there is no clear and convincing evidence in this record to demonstrate that Judge Spicer failed to report an in-kind contribution. See

*Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph two of the syllabus ("In disciplinary proceedings, the relator bears the burden of proving the facts necessary to establish a violation. The complaint must allege the specific misconduct that violates the Disciplinary Rules and relator must prove such misconduct by clear and convincing evidence"); see, also, Gov.Bar R. V(6)(J).

{¶ 30} With due respect to the dissent, the advertising dollars spent by the Summit County Republican Party here helped not only Judge Spicer, but also other Republican candidates and, therefore, constituted a party expenditure on behalf of those candidates, not an independent expenditure.

{¶ 31} And while the dissent incorporates a news account about an individual who is not mentioned anywhere in our record and challenges findings that we "could" have made, our review is confined to what is contained in the record before us.

{¶ 32} Despite other criticism from the dissent, two aspects of the majority opinion remain unchallenged: (1) standards have been adopted to regulate the conduct of future judicial campaigns and (2) a review of the evidence here as determined by the Board of Commissioners on Grievances does not support a finding by clear and convincing evidence that Judge Spicer violated Canon 7 regarding Count II. Our decision, therefore, is based on the evidence presented in this case and the law and nothing more.

{¶ 33} We therefore accept the recommendation of the Board of Commissioners on Grievances and Discipline to dismiss Count II of the complaint. However, because Judge Spicer has not objected to the board's findings with respect to the inappropriate content of the disputed ad in the first count, and because both parties have agreed with the sanction recommended by the board, we do not disturb those findings and impose a public reprimand for that conduct.[4] Costs are taxed equally to the parties.

*Judgment accordingly.*

---

4. The complaint alleged and the parties do not dispute the following: violations of Canon 2 of the Code of Judicial Conduct (requiring that a judge act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), Canon 7(E)(1) (admonishing that a judicial candidate shall not, by means of campaign materials, "knowingly or with reckless disregard * * * [p]ost, publish, broadcast, transmit, circulate, or distribute information concerning a judicial candidate or an opponent, either knowing the information to be false or with a reckless disregard of whether or not it was false or, if true, that would be deceiving or misleading to a reasonable person"), and Gov.Bar R. V(11)(E) (advising that "[a]ll proceedings and documents relating to review and investigation of grievances made under these rules shall be private" unless that person waives privacy of the proceedings).

MOYER, C.J., LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

RESNICK and PFEIFER, JJ., dissent.

---

**PFEIFER, J., dissenting.**

{¶ 34} This is, at its essence, a case determining the extent of involvement a judicial campaign may have with groups making independent campaign expenditures. If, as the majority holds, the Summit County Republican Party's $97,000 outlay in this case was not an in-kind contribution, then by law it can only have been one other thing: an independent expenditure. The fact that a political party was the contributor is irrelevant. Political parties have a special status under Canon 7, but that status extends only to their increased contribution limits. Under former Canon 7, "any organization" could make a contribution of up to $2,750 to a lower court candidate; a political party could have donated up to $48,000. See former Canon 7(C)(5)(ii) and (iii)(D), 90 Ohio St.3d CXX. Beyond that point, political parties become no different from any other organization—any expenditure made in support of a candidate must be made independently of the candidate's campaign committee.

{¶ 35} Canon 7's definition of "in-kind contribution" is the linchpin in the governance of judicial campaigns in Ohio. The definition of "in-kind contribution" determines whether contribution limits will be meaningful and to what extent judicial-campaign committees can intertwine themselves with independent-expenditure committees. The majority eviscerates Canon 7, holding that a candidate's chief campaign organizer can work directly with a group making an independent-expenditure. Today's decision encourages unaccountability for candidates and inappropriate interaction between candidate committees and independent-expenditure committees.

{¶ 36} The majority ignores the agency aspect of Canon 7, which makes the same prohibitions on judges' agents as it does on the judges themselves. Whether Joseph Masich had an official title or not, both parties agree that he ran the Spicer campaign as its "de facto organizer." The lack of an official hierarchy in the Spicer campaign reflects the reality of political campaigns. Campaigns can be run by a loose association of consultants, whose claimed input rises and falls with the latest polls, or, in smaller races, by one person helping the candidate. With or without titles and job descriptions, those people are the candidates' agents. Legally, a candidate need only identify a campaign treasurer, R.C. 3517.081, but Canon 7's prohibitions are not limited to the candidate and the treasurer. Canon 7 accounts for the differing structure of individual campaigns by employing the broad term "agent." See Canon 7(A)(4). Certainly, Masich fits within that term.

{¶ 37} The majority points to Masich's differing motivations in arranging for the broadcast of Spicer's commercials, implying that Masich was not acting solely on Spicer's behalf. The majority says that, in part, Masich was serving "his own interest as court administrator in seeing Judge Spicer reelected." However, Canon 7 is indifferent to motivation. Worse, under the majority's reasoning, the unsavory fact that Judge Spicer had his highest level court employee running his reelection campaign somehow inures to Judge Spicer's benefit in this case.

{¶ 38} As for the candidate himself, Judge Spicer knew about the commercial, knew about its varied uses, and appeared in it. The majority decides that since Spicer's de facto campaign organizer, and not Spicer himself, decided the exact media placement of the commercial, Spicer is beyond the reach of Canon 7. This court has created an "I wasn't at the meeting" defense. Under this defense, a judicial candidate can meet with his own campaign staff and give explicit instructions regarding the independent expenditure. Campaign staffers can then meet with the independent-expenditure committee and even give them a completed commercial filmed by the candidate. Somehow, in the majority's view, that is not a violation of Canon 7.

{¶ 39} The majority cites cases in support of its decision that present factual scenarios directly at odds with the facts in this case. Those cases deal with political operatives at the fringes of campaigns; none address a case as blatant as the campaign's organizer interacting with an independent group. In *Colorado Republican Fed. Campaign Commt. v. Fed. Election Comm.* (1996), 518 U.S. 604, 614, 116 S.Ct. 2309, 135 L.Ed.2d 795, the Colorado Republican Party had made its expenditures on radio advertisements before the party even had a nominee, the party chairman had developed the script on his own, and all relevant discussions had taken place at meetings attended only by Republican Party staff. In the case before us, the party staffer was *running* the party-endorsed candidate's campaign.

{¶ 40} In *Democratic Senatorial Campaign Commt. v. Fed. Election Comm.* (D.D.C.1990), 745 F.Supp. 742, 746, the court found no illegalities where the candidate's campaign committee and a political action committee ("PAC") had campaign consultants in common. In that case, the election was in Florida, and the consultants had done no work for the PAC in that state. The court found that the PAC had "built a 'Chinese Wall' between itself and the two [candidate] consultants." Id. Here, there can be no Chinese Wall because we are dealing with the same person working for both entities.

{¶ 41} The level of consanguinity that the majority finds acceptable between a judicial campaign and an independent-expenditure committee places this court far outside the mainstream. No amount of handwringing about the tangled relationship between Masich, the party, Sagamore Communications, and Judge Spicer's

campaign will obscure the majority's neon, bottom-line holding: NO VIOLA-TION. It is an open invitation to entanglement between candidate committees and outside contributors. Corporations, forbidden to contribute under Ohio law to candidates or political parties, R.C. 3599.03(A)(1), can form independent-expenditure committees with the knowledge that they can work closely with a candidate's campaign staff. Will corporations be interested? In 2003, former AIG chairman and chief executive Maurice "Hank" Greenberg laid out a plan to influence judicial races by essentially laundering donations through the Chamber of Commerce. After a meeting with Thomas Donahue, president and chief executive of the U.S. Chamber of Commerce, Greenberg stated: " 'We're looking at having a say in some of those elections, who should be backed and who shouldn't. * * * There's a war and we will continue to fight that for some time.' " Financial Times, U.S. Edition (Sept. 4, 2003) 16.

{¶ 42} The majority could have done the simple, logical thing and found a violation of Canon 7. The Disciplinary Counsel sought no additional penalty beyond the public reprimand Judge Spicer was already receiving. Indeed, the factors cited by the majority in finding no violation could have more properly been raised as mitigation for penalty purposes. A precedent could have been set for future judicial candidates, without material harm to Judge Spicer. Whatever the majority's intention, the reality is that this opinion allows corporate interests to blow the lid off spending limits by forming independent-expenditure committees and working closely in concert with the agents of candidates to craft a message. Mr. Greenberg would certainly approve, if he is not too preoccupied with his own ethical problems.

RESNICK, J., concurs in the foregoing dissenting opinion.

––––––––––

Jonathan E. Coughlan, Disciplinary Counsel, for relator.

Montgomery, Rennie & Jonson and George D. Jonson, for respondent.